## VOLKSWAGENWERK AKTIENGESELLSCHAFT *v.* SCHLUNK, ADMINISTRATOR OF THE ESTATES OF SCHLUNK ET AL.

No. 86–1052.   Argued March 21, 1988—Decided June 15, 1988

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, STEVENS, SCALIA, and KENNEDY, JJ., joined. BRENNAN, J., filed an opinion concurring in the judgment, in which MARSHALL and BLACKMUN, JJ., joined, *post*, p. 708.

*Herbert Rubin* argued the cause for petitioner. With him on the briefs were *Stephen M. Shapiro, Kenneth S. Geller, Michael Hoenig,* and *James K. Toohey.*

*Jack Samuel Ring* argued the cause for respondent. With him on the brief was *Judith E. Fors.*

*Jeffrey P. Minear* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Fried, Assistant Attorney General Willard, Deputy Solicitor General Merrill, Deputy Assistant*

Attorney General *Spears, David Epstein,* and *Abraham D. Sofaer.**

JUSTICE O'CONNOR delivered the opinion of the Court.

This case involves an attempt to serve process on a foreign corporation by serving its domestic subsidiary which, under state law, is the foreign corporation's involuntary agent for service of process. We must decide whether such service is compatible with the Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters, Nov. 15, 1965 (Hague Service Convention), [1969] 20 U. S. T. 361, T. I. A. S. No. 6638.

## I

The parents of respondent Herwig Schlunk were killed in an automobile accident in 1983. Schlunk filed a wrongful death action on their behalf in the Circuit Court of Cook County, Illinois. Schlunk alleged that Volkswagen of America, Inc. (VWoA), had designed and sold the automobile that his parents were driving, and that defects in the automobile caused or contributed to their deaths. Schlunk also alleged that the driver of the other automobile involved in the collision was negligent; Schlunk has since obtained a default judgment against that person, who is no longer a party to this lawsuit. Schlunk successfully served his complaint on VWoA, and VWoA filed an answer denying that it had designed or assembled the automobile in question. Schlunk then amended the complaint to add as a defendant Volkswagen Aktiengesellschaft (VWAG), which is the petitioner

*\*Peter Heidenberger* filed a brief for the Federal Republic of Germany as *amicus curiae* urging reversal.

*Leonard M. Ring* filed a brief for the Trial Lawyers of America as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed for the Illinois Trial Lawyers Association by *William J. Harte;* and for the Motor Vehicle Manufacturers Association of the United States, Inc., by *Jay M. Smyser, William H. Crabtree,* and *Edward P. Good.*

here. VWAG, a corporation established under the laws of the Federal Republic of Germany, has its place of business in that country. VWoA is a wholly owned subsidiary of VWAG. Schlunk attempted to serve his amended complaint on VWAG by serving VWoA as VWAG's agent.

VWAG filed a special and limited appearance for the purpose of quashing service. VWAG asserted that it could be served only in accordance with the Hague Service Convention, and that Schlunk had not complied with the Convention's requirements. The Circuit Court denied VWAG's motion. It first observed that VWoA is registered to do business in Illinois and has a registered agent for receipt of process in Illinois. The court then reasoned that VWoA and VWAG are so closely related that VWoA is VWAG's agent for service of process as a matter of law, notwithstanding VWAG's failure or refusal to appoint VWoA formally as an agent. The court relied on the facts that VWoA is a wholly owned subsidiary of VWAG, that a majority of the members of the board of directors of VWoA are members of the board of VWAG, and that VWoA is by contract the exclusive importer and distributor of VWAG products sold in the United States. The court concluded that, because service was accomplished within the United States, the Hague Service Convention did not apply.

The Circuit Court certified two questions to the Appellate Court of Illinois. For reasons similar to those given by the Circuit Court, the Appellate Court determined that VWoA is VWAG's agent for service of process under Illinois law, and that the service of process in this case did not violate the Hague Service Convention. 145 Ill. App. 3d 594, 503 N. E. 2d 1045 (1986). After the Supreme Court of Illinois denied VWAG leave to appeal, 112 Ill. 2d 595 (1986), VWAG petitioned this Court for a writ of certiorari to review the Appellate Court's interpretation of the Hague Service Convention. We granted certiorari to address this issue, 484 U. S. 895 (1987), which has given rise to disagreement among the lower

courts. Compare *Ex parte Volkswagenwerk A. G.*, 443 So. 2d 880, 881 (Ala. 1983) (holding that the Hague Service Convention does not apply if a foreign national is served properly through its agent in this country); *Zisman* v. *Sieger*, 106 F. R. D. 194, 199–200 (ND Ill. 1985) (same); *Lamb* v. *Volkswagenwerk A. G.*, 104 F. R. D. 95, 97 (SD Fla. 1985) (same); *McHugh* v. *International Components Corp.*, 118 Misc. 2d 489, 491–492, 461 N. Y. S. 2d 166, 167–168 (1983) (same), with *Cippolla* v. *Picard Porsche Audi, Inc.*, 496 A. 2d 130, 131–132 (R. I. 1985) (holding that the Hague Service Convention is the exclusive means of serving a foreign corporation); *Wingert* v. *Volkswagenwerk A. G.*, Civ. Action Nos. 3:86–2994–16 and 3:86–2995–16 (S. C. May 19, 1987), slip op., at 3–4 (same).

## II

The Hague Service Convention is a multilateral treaty that was formulated in 1964 by the Tenth Session of the Hague Conference of Private International Law. The Convention revised parts of the Hague Conventions on Civil Procedure of 1905 and 1954. The revision was intended to provide a simpler way to serve process abroad, to assure that defendants sued in foreign jurisdictions would receive actual and timely notice of suit, and to facilitate proof of service abroad. 3 1964 Conférence de la Haye de Droit International Privé, Actes et Documents de la Dixième Session (Notification) 75–77, 363 (1965) (3 Actes et Documents); 1 B. Ristau, International Judicial Assistance (Civil and Commercial) § 4–1 (1984 and 1 Supp. 1986) (1 Ristau). Representatives of all 23 countries that were members of the Conference approved the Convention without reservation. Thirty-two countries, including the United States and the Federal Republic of Germany, have ratified or acceded to the Convention. Brief for United States as *Amicus Curiae* 2, n. 2 (filed Sep. 12, 1987).

The primary innovation of the Convention is that it requires each state to establish a central authority to receive requests for service of documents from other countries. 20

U. S. T. 362, T. I. A. S. 6638, Art. 2. Once a central authority receives a request in the proper form, it must serve the documents by a method prescribed by the internal law of the receiving state or by a method designated by the requester and compatible with that law. Art. 5. The central authority must then provide a certificate of service that conforms to a specified model. Art. 6. A state also may consent to methods of service within its boundaries other than a request to its central authority. Arts. 8–11, 19. The remaining provisions of the Convention that are relevant here limit the circumstances in which a default judgment may be entered against a defendant who had to be served abroad and did not appear, and provide some means for relief from such a judgment. Arts. 15, 16.

Article 1 defines the scope of the Convention, which is the subject of controversy in this case. It says: "The present Convention shall apply in all cases, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad." 20 U. S. T., at 362. The equally authentic French version says, "La présente Convention est applicable, en matière civile ou commerciale, dans tous les cas où un acte judiciaire ou extrajudiciaire doit être transmis à l'étranger pour y être signifié ou notifié." *Ibid.* This language is mandatory, as we acknowledged last Term in *Société Nationale Industrielle Aérospatiale* v. *United States District Court*, 482 U. S. 522, 534, n. 15 (1987). By virtue of the Supremacy Clause, U. S. Const., Art. VI, the Convention pre-empts inconsistent methods of service prescribed by state law in all cases to which it applies. Schlunk does not purport to have served his complaint on VWAG in accordance with the Convention. Therefore, if service of process in this case falls within Article 1 of the Convention, the trial court should have granted VWAG's motion to quash.

When interpreting a treaty, we "begin 'with the text of the treaty and the context in which the written words are used.'"

*Société Nationale, supra,* at 534 (quoting *Air France* v. *Saks,* 470 U. S. 392, 397 (1985)). Other general rules of construction may be brought to bear on difficult or ambiguous passages. " 'Treaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties.' " *Air France* v. *Saks, supra,* at 396 (quoting *Choctaw Nation of Indians* v. *United States,* 318 U. S. 423, 431–432 (1943)).

The Convention does not specify the circumstances in which there is "occasion to transmit" a complaint "for service abroad." But at least the term "service of process" has a well-established technical meaning. Service of process refers to a formal delivery of documents that is legally sufficient to charge the defendant with notice of a pending action. 1 Ristau § 4–5(2), p. 123 (interpreting the Convention); Black's Law Dictionary 1227 (5th ed. 1979); see 4 C. Wright & A. Miller, Federal Practice and Procedure § 1063, p. 225 (2d ed. 1987). The legal sufficiency of a formal delivery of documents must be measured against some standard. The Convention does not prescribe a standard, so we almost necessarily must refer to the internal law of the forum state. If the internal law of the forum state defines the applicable method of serving process as requiring the transmittal of documents abroad, then the Hague Service Convention applies.

The negotiating history supports our view that Article 1 refers to service of process in the technical sense. The committee that prepared the preliminary draft deliberately used a form of the term "notification" (formal notice), instead of the more neutral term "remise" (delivery), when it drafted Article 1. 3 Actes et Documents, at 78–79. Then, in the course of the debates, the negotiators made the language even more exact. The preliminary draft of Article 1 said that the present Convention shall apply in all cases in which there are grounds *to transmit or to give formal notice of*

a judicial or extrajudicial document in a civil or commercial matter to a person staying abroad. *Id.*, at 65 ("La présente Convention est applicable dans tous les cas où il y a lieu *de transmettre ou de notifier* un acte judiciaire ou extrajudiciaire en matière civile ou commerciale à une personne se trouvant à l'étranger") (emphasis added). To be more precise, the delegates decided to add a form of the juridical term "signification" (service), which has a narrower meaning than "notification" in some countries, such as France, and the identical meaning in others, such as the United States. *Id.*, at 152–153, 155, 159, 366. The delegates also criticized the language of the preliminary draft because it suggested that the Convention could apply to transmissions abroad that do not culminate in service. *Id.*, at 165–167. The final text of Article 1, *supra*, eliminates this possibility and applies only to documents transmitted for service abroad. The final report *(Rapport Explicatif)* confirms that the Convention does not use more general terms, such as delivery or transmission, to define its scope because it applies only when there is both transmission of a document from the requesting state to the receiving state, and service upon the person for whom it is intended. *Id.*, at 366.

The negotiating history of the Convention also indicates that whether there is service abroad must be determined by reference to the law of the forum state. The preliminary draft said that the Convention would apply "where there are grounds" to transmit a judicial document to a person staying abroad. The committee that prepared the preliminary draft realized that this implied that the forum's internal law would govern whether service implicated the Convention. *Id.*, at 80–81. The reporter expressed regret about this solution because it would decrease the obligatory force of the Convention. *Id.*, at 81. Nevertheless, the delegates did not change the meaning of Article 1 in this respect.

The Yugoslavian delegate offered a proposal to amend Article 1 to make explicit that service abroad is defined ac-

cording to the law of the state that is requesting service of process. *Id.*, at 167. The delegate from the Netherlands supported him. *Ibid.* The German delegate approved of the proposal in principle, although he thought it would require a corresponding reference to the significance of the law of the state receiving the service of process, and that this full explanation would be too complicated. *Id.*, at 168. The President opined that there was a choice to be made between the phrase used by the preliminary draft, "where grounds exist," and the Yugoslavian proposal to modify it with the phrase, "according to the law of the requesting state." *Ibid.* This prompted the Yugoslavian delegate to declare that the difference was immaterial, because the phrase "where grounds exist" necessarily refers to the law of the forum. *Ibid.* The French delegate added that, in his view, the law of the forum in turn is equivalent to the law of the requesting state. *Id.*, at 169. At that point, the President recommended entrusting the problem to the drafting committee.

The drafting committee then composed the version of Article 1 that ultimately was adopted, which says that the Convention applies "where there is occasion" to transmit a judicial document for service abroad. *Id.*, at 211. After this revision, the reporter again explained that one must leave to the requesting state the task of defining when a document must be served abroad; that this solution was a consequence of the unavailability of an objective test; and that while it decreases the obligatory force of the Convention, it does provide clarity. *Id.*, at 254. The inference we draw from this history is that the Yugoslavian proposal was rejected because it was superfluous, not because it was inaccurate, and that "service abroad" has the same meaning in the final version of the Convention as it had in the preliminary draft.

VWAG protests that it is inconsistent with the purpose of the Convention to interpret it as applying only when the internal law of the forum requires service abroad. One of the two stated objectives of the Convention is "to create

appropriate means to ensure that judicial and extrajudicial documents to be served abroad shall be brought to the notice of the addressee in sufficient time." 20 U. S. T., at 362. The Convention cannot assure adequate notice, VWAG argues, if the forum's internal law determines whether it applies. VWAG warns that countries could circumvent the Convention by defining methods of service of process that do not require transmission of documents abroad. Indeed, VWAG contends that one such method of service already exists and that it troubled the Conference: *notification au parquet.*

*Notification au parquet* permits service of process on a foreign defendant by the deposit of documents with a designated local official. Although the official generally is supposed to transmit the documents abroad to the defendant, the statute of limitations begins to run from the time that the official receives the documents, and there allegedly is no sanction for failure to transmit them. 3 Actes et Documents, at 167–169; S. Exec. Rep. No. 6, 90th Cong., 1st Sess., 12 (1967) (statement of Philip Amram, member of the United States delegation); 1 Ristau § 4–33, p. 172. At the time of the 10th Conference, France, the Netherlands, Greece, Belgium, and Italy utilized some type of *notification au parquet.* 3 Actes et Documents, at 75.

There is no question but that the Conference wanted to eliminate *notification au parquet. Id.,* at 75–77. It included in the Convention two provisions that address the problem. Article 15 says that a judgment may not be entered unless a foreign defendant received adequate and timely notice of the lawsuit. Article 16 provides means whereby a defendant who did not receive such notice may seek relief from a judgment that has become final. 20 U. S. T., at 364–365. Like Article 1, however, Articles 15 and 16 apply only when documents must be transmitted abroad for the purpose of service. 3 Actes et Documents, at 168–169. VWAG argues that, if this determination is made

according to the internal law of the forum state, the Convention will fail to eliminate variants of *notification au parquet* that do not expressly require transmittal of documents to foreign defendants. Yet such methods of service of process are the least likely to provide a defendant with actual notice.

The parties make conflicting representations about whether foreign laws authorizing *notification au parquet* command the transmittal of documents for service abroad within the meaning of the Convention. The final report is itself somewhat equivocal. It says that, although the strict language of Article 1 might raise a question as to whether the Convention regulates *notification au parquet*, the understanding of the drafting Commission, based on the debates, is that the Convention would apply. *Id.*, at 367. Although this statement might affect our decision as to whether the Convention applies to *notification au parquet*, an issue we do not resolve today, there is no comparable evidence in the negotiating history that the Convention was meant to apply to substituted service on a subsidiary like VWoA, which clearly does not require service abroad under the forum's internal law. Hence neither the language of the Convention nor the negotiating history contradicts our interpretation of the Convention, according to which the internal law of the forum is presumed to determine whether there is occasion for service abroad.

Nor are we persuaded that the general purposes of the Convention require a different conclusion. One important objective of the Convention is to provide means to facilitate service of process abroad. Thus the first stated purpose of the Convention is "to create" appropriate means for service abroad, and the second stated purpose is "to improve the organisation of mutual judicial assistance for that purpose by simplifying and expediting the procedure." 20 U. S. T., at 362. By requiring each state to establish a central authority to assist in the service of process, the Convention implements this enabling function. Nothing in our decision today interferes with this requirement.

VWAG correctly maintains that the Convention also aims to ensure that there will be adequate notice in cases in which there is occasion to serve process abroad. Thus compliance with the Convention is mandatory in all cases to which it applies, see *supra*, 700–701, and Articles 15 and 16 provide an indirect sanction against those who ignore it, see 3 Actes et Documents, at 92, 363. Our interpretation of the Convention does not necessarily advance this particular objective, inasmuch as it makes recourse to the Convention's means of service dependent on the forum's internal law. But we do not think that this country, or any other country, will draft its internal laws deliberately so as to circumvent the Convention in cases in which it would be appropriate to transmit judicial documents for service abroad. For example, there has been no question in this country of excepting foreign nationals from the protection of our Due Process Clause. Under that Clause, foreign nationals are assured of either personal service, which typically will require service abroad and trigger the Convention, or substituted service that provides "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U. S. 306, 314 (1950).*

---

*The concurrence believes that our interpretation does not adequately guarantee timely notice, which it denominates the "primary" purpose of the Convention, albeit without authority. *Post*, at 711. The concurrence instead proposes to impute a substantive standard to the words, "service abroad." *Post*, at 708. Evidently, a method of service would not be deemed to be "service abroad" within the meaning of Article 1 unless it provides notice to the recipient "in due time." *Post*, at 712, 714. This due process notion cannot be squared with the plain meaning of the words, "service abroad." The contours of the concurrence's substantive standard are not defined, and we note that it would create some uncertainty even on the facts of this case. If the substantive standard tracks the Due Process Clause of the Fourteenth Amendment, it is not self-evident that substituted service on a subsidiary is sufficient with respect to the parent. In

Furthermore, nothing that we say today prevents compliance with the Convention even when the internal law of the forum does not so require. The Convention provides simple and certain means by which to serve process on a foreign national. Those who eschew its procedures risk discovering that the forum's internal law required transmittal of documents for service abroad, and that the Convention therefore provided the exclusive means of valid service. In addition, parties that comply with the Convention ultimately may find it easier to enforce their judgments abroad. See Westin, Enforcing Foreign Commercial Judgments and Arbitral Awards in the United States, West Germany, and England, Law & Policy Int'l Bus. 325, 340–341 (1987). For these reasons, we anticipate that parties may resort to the Convention voluntarily, even in cases that fall outside the scope of its mandatory application.

### III

In this case, the Illinois long-arm statute authorized Schlunk to serve VWAG by substituted service on VWoA, without sending documents to Germany. See Ill. Rev. Stat., ch. 110, ¶ 2–209(a)(1) (1985). VWAG has not petitioned for review of the Illinois Appellate Court's holding that service was proper as a matter of Illinois law. VWAG contends, however, that service on VWAG was not complete until VWoA transmitted the complaint to VWAG in Germany. According to VWAG,

---

the only cases in which it has considered the question, this Court held that the activities of a subsidiary are not necessarily enough to render a parent subject to a court's jurisdiction, for service of process or otherwise. *Cannon Mfg. Co.* v. *Cudahy Packing Co.*, 267 U. S. 333, 336–337 (1925); *Consolidated Textile Corp.* v. *Gregory*, 289 U. S. 85, 88 (1933); see 18A W. Fletcher, Cyclopedia of Law of Private Corporations § 8773 pp. 250–254 (rev. ed. 1988). Although the particular relationship between VWAG and VWoA might have made substituted service valid in this case, a question that we do not decide, the factbound character of the necessary inquiry makes us doubt whether the standard suggested by the concurrence would in fact be "remarkably easy" to apply, see *post*, at 715.

this transmission constituted service abroad under the Hague Service Convention.

VWAG explains that, as a practical matter, VWoA was certain to transmit the complaint to Germany to notify VWAG of the litigation. Indeed, as a legal matter, the Due Process Clause requires every method of service to provide "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane* v. *Central Hanover Bank & Trust Co., supra,* at 314. VWAG argues that, because of this notice requirement, every case involving service on a foreign national will present an "occasion to transmit a judicial . . . document for service abroad" within the meaning of Article 1. Tr. of Oral Arg. 8. VWAG emphasizes that in this case, the Appellate Court upheld service only after determining that "the relationship between VWAG and VWoA is so close that it is certain that VWAG 'was fully apprised of the pendency of the action' by delivery of the summons to VWoA." 145 Ill. App. 3d, at 606, 503 N. E. 2d, at 1053 (quoting *Maunder* v. *DeHavilland Aircraft of Canada, Ltd.,* 102 Ill. 2d 342, 353, 466 N. E. 2d 217, 223, cert. denied, 469 U. S. 1036 (1984)).

We reject this argument. Where service on a domestic agent is valid and complete under both state law and the Due Process Clause, our inquiry ends and the Convention has no further implications. Whatever internal, private communications take place between the agent and a foreign principal are beyond the concerns of this case. The only transmittal to which the Convention applies is a transmittal abroad that is required as a necessary part of service. And, contrary to VWAG's assertion, the Due Process Clause does not require an official transmittal of documents abroad every time there is service on a foreign national. Applying this analysis, we conclude that this case does not present an occasion to transmit a judicial document for service abroad within the mean-

ing of Article 1. Therefore the Hague Service Convention does not apply, and service was proper. The judgment of the Appellate Court is

*Affirmed.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, concurring in the judgment.

We acknowledged last Term, and the Court reiterates today, *ante*, at 699, that the terms of the Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, [1969] 20 U. S. T. 361, T. I. A. S. No. 6638, are "mandatory," not "optional" with respect to any transmission that Article 1 covers. *Société Nationale Industrielle Aérospatiale* v. *United States District Court*, 482 U. S. 522, 534, and n. 15 (1987). Even so, the Court holds, and I agree, that a litigant may, consistent with the Convention, serve process on a foreign corporation by serving its wholly owned domestic subsidiary, because such process is not "service abroad" within the meaning of Article 1. The Court reaches that conclusion, however, by depriving the Convention of any mandatory effect, for in the Court's view the "forum's internal law" defines conclusively whether a particular process is "service abroad," which is covered by the Convention, or domestic service, which is not. *Ante*, at 704. I do not join the Court's opinion because I find it implausible that the Convention's framers intended to leave each contracting nation, and each of the 50 States within our Nation, free to decide for itself under what circumstances, if any, the Convention would control. Rather, in my view, the words "service abroad," read in light of the negotiating history, embody a substantive standard that limits a forum's latitude to deem service complete domestically.

The first of two objectives enumerated in the Convention's preamble is "to create appropriate means to ensure that judicial . . . documents to be served abroad shall be brought to the notice of the addressee in sufficient time . . . ." 20 U. S. T., at 362. See also *ante*, at 702–703. Until the Con-

vention was implemented, the contracting nations followed widely divergent practices for serving judicial documents across international borders, some of which did not ensure any notice, much less timely notice, and therefore often produced unfair default judgments. See generally International Co-Operation in Litigation: Europe (H. Smit ed. 1965); 3 1965 Conférence de la Haye de Droit International Privé, Actes et Documents de la Dixième Session (Notification) 11–12 (1965) (hereinafter 3 Actes et Documents). Particularly controversial was a procedure, common among civil-law countries, called *"notification au parquet,"* which permitted delivery of process to a local official who was then ordinarily supposed to transmit the document abroad through diplomatic or other channels. See S. Exec. Rep. No. 6, 90th Cong., 1st Sess., 11–12, 14–16 (1967) (S. Exec. Rep. No. 6); S. Doc. C, 90th Cong., 1st Sess., 5–6, 21 (1967) (S. Exec. Doc. C). Typically, service was deemed complete upon delivery of the document to the official whether or not the official succeeded in transmitting it to the defendant and whether or not the defendant otherwise received notice of the pending lawsuit.[1]

---

[1] The head of the United States delegation to the Convention described *notification au parquet* as follows:

"This is a system which permits the entry of judgments in personam by default against a nonresident defendant without requiring adequate notice. There is also no real right to move to open the default judgment or to appeal, because the time to move to open judgment or to appeal will generally have expired before the defendant finds out about the judgment.

"Under this system of service, the process-server simply delivers a copy of the writ to a public official's office. The time for answer begins to run immediately. Some effort is supposed to be made through the Foreign Office and through diplomatic channels to give the defendant notice, but failure to do this has no effect on the validity of the service. . . .

"There are no . . . limitations and protections [comparable to due process or personal jurisdiction] under the *notification au parquet* system. Here jurisdiction lies merely if the plaintiff is a local national; nothing more is needed." S. Exec. Rep. No. 6, at 11–12 (statement by Philip W. Amram). See also S. Exec. Doc. C, at 5 (letter of submittal from Secretary of State Rusk); Amram, The Revolutionary Change in Service of Process Abroad in French Civil Procedure, 2 Int'l Law. 650, 650–651 (1968) (Amram).

The United States delegation to the Convention objected to *notification au parquet* as inconsistent with "the requirements of 'due process of law' under the Federal Constitution." 3 Actes et Documents 128 (citations omitted). The head of the delegation has derided its "'[i]njustice, extravagance, [and] absurdity . . . .'" Amram 651 (citation omitted). In its classic formulation, he observed, *notification au parquet* "'totally sacrificed all rights of the defense in favor of the plaintiff.'" *Id.*, at 652, n. 9 (citation omitted). The Convention's official reporter noted similar "'spirited criticisms of the system' . . . which we wish to see eliminated." 3 Actes et Documents 76 (translated).

In response to this and other concerns, the Convention prescribes the exclusive means for service of process emanating from one contracting nation and culminating in another. As the Court observes, the Convention applies only when the document is to be "transmit[ted] . . . for service abroad"; it covers not every transmission of judicial documents abroad, but only those transmissions abroad that constitute formal "service." See *ante*, at 700. It is common ground that the Convention governs when the procedure prescribed by the internal law of the forum nation or state provides that service is not complete until the document is transmitted abroad. That is not to say, however, as does the Court, that the forum nation may designate any type of service "domestic" and thereby avoid application of the Convention.

Admittedly, as the Court points out, *ibid.*, the Convention's language does not prescribe a precise standard to distinguish between "domestic" service and "service abroad." But the Court's solution leaves contracting nations free to ignore its terms entirely, converting its command into exhortation. Under the Court's analysis, for example, a forum nation could prescribe direct mail service to any foreigner and deem service effective upon deposit in the mailbox, or could arbitrarily designate a domestic agent for any foreign defendant and deem service complete upon receipt domestically by

the agent even though there is little likelihood that service would ever reach the defendant. In fact, so far as I can tell, the Court's interpretation permits any contracting nation to revive *notification au parquet* so long as the nation's internal law deems service complete domestically, but cf. *ante,* at 704, even though, as the Court concedes, "such methods of service are the least likely to provide a defendant with actual notice," and even though "[t]here is no question but that the Conference wanted to eliminate *notification au parquet,*" *ante,* at 703 (citation omitted).

The Court adheres to this interpretation, which (in the Court's words) "does not necessarily advance" the primary purpose that the Convention itself announces, *ante,* at 705, notwithstanding its duty to read the Convention "with a view to effecting the objects and purposes of the States thereby contracting." *Rocca* v. *Thompson,* 223 U. S. 317, 331–332 (1912). See *Factor* v. *Laubenheimer,* 290 U. S. 276, 293–294 (1933); *Wright* v. *Henkel,* 190 U. S. 40, 57 (1903). Even assuming any quantum of evidence from the negotiating history would suffice to support an interpretation so fundamentally at odds with the Convention's primary purpose, the evidence the Court amasses in support of its reading—two interim comments by the reporter on initial drafts of the Convention suggesting that the forum's internal law would dictate whether a particular form of service implicates the Convention—falls far short. See *ante,* at 701–702.

In the first place, the reporter's comments were by no means uncontroversial. One participant, for example, directly challenged the "report['s] allusion . . . to the danger that the court hearing the proceeding could decide that there were no grounds for service," and observed that "[n]ow, the preamble of [the] draft specifies the objective of the convention, which is to ensure the service of writs to persons in foreign countries in order *to guarantee that these persons will have knowledge of them.*" 3 Actes et Documents 165 (United Kingdom delegate) (translation) (emphasis added).

In fact, the delegates considered a version of Article 1 explicitly prescribing that the Convention's scope would be defined "'according to the law of the petitioning state,'" *id.*, at 167 (quoting proposal of Yugoslavian delegate) (translation), but rejected the proposal at least in part "because it would allow [domestic] law to determine the cases in which transmission is not obligatory." *Ibid.* (Italian delegate) (translation).

If the delegates did not resolve their differences upon tabling the proposal, they apparently did by the time the official reporter issued his *Rapport Explicatif.* This final report, which presumably supersedes all interim comments, stresses "the opinion of the Third Commission [that] the Convention was 'obligatory,'" making no reference to internal law. 3 Actes et Documents 366 (translation). By way of example, the *Rapport* acknowledges that a literal reading of the Convention might raise doubts as to the Convention's coverage of *notification au parquet,* yet announces the understanding of the drafting commission that the Convention would prohibit such service.[2] Thus, reading Article 1 "'in the liberal spirit in which it is intended[,]'" to address "'the hardship and injustice, which [the Convention] seeks to relieve,'" *id.*, at 367 (citation omitted), the *Rapport* interprets the Convention to impose a substantive standard proscribing *notification au parquet* whether the forum nation deems the service "domestic" or "abroad." That substantive standard is captured in the *Rapport*'s admonition that

> "'[a]ll of the transmission channels (prescribed by the convention) *must have as a consequence the fact that the act reach the addressee in due time.* That is a require-

---

[2] 3 Actes et Documents 367 (emphasis in original; footnote omitted): "However, when confronted with the strict letter of the provision, one can always ask the question of knowing whether or not, when a State permits the service or notification of a person in a foreign country to be made *[au parquet]*, the convention is applicable.

"THE AUTHENTIC INTERPRETATION OF THE COMMISSION AS IT EMERGES FROM THE DISCUSSIONS, IS IN THE SENSE OF THE APPLICATION OF THE CONVENTION."

ment of justice, which assumes its full importance when the act to be transmitted is an act instituting proceedings.'" *Ibid.* (translation) (footnote omitted; emphasis added).

The Court belittles the *Rapport*'s significance by presuming that the reporter assumed, as a matter of the internal law of the various nations then permitting *notification au parquet,* that such service always required transmission abroad, and therefore would always have been deemed "service abroad." See *ante,* at 703–704. But the above-cited passage purports to interpret the Convention, not to survey the various forms of *notification au parquet* then prevalent, and does not so much as hint at the possibility that *notification au parquet* might continue if the domestic law of a forum nation were to deem it "domestic." Moreover, the assumption that the Court imputes to the *Rapport* is inaccurate; as noted above, *notification au parquet* was typically deemed complete upon delivery to the local official. See *supra,* at 709, and n. 1. Any requirement of transmission abroad was no more essential to formal service than is the informal arrangement by which a domestic subsidiary might transmit documents served on it as an agent for its foreign parent. See, *e. g.,* 3 Actes et Documents 169. Thus, if the Court entertains the possibility that the Convention bans *notification au parquet* under all circumstances, *ante,* at 704, it can only be because (notwithstanding the Court's stated analysis) the Convention, read in light of its negotiating history, sets some substantive limit on the forum state's latitude to deem such service "domestic."

Significantly, our own negotiating delegation, whose contemporaneous views are "entitled to great weight," *Société Nationale,* 482 U. S., at 536, n. 19, took seriously the *Rapport*'s conclusion that the Convention is more than just precatory. The delegation's report applauded the Convention as "mak[ing] substantial changes in the practices of many of the civil law countries, moving their practices in the direction of the U. S. approach to international judicial assistance and our

concepts of due process in the service of process." S. Exec. Doc. C, at 20 (emphasis added). The delegation's chief negotiator emphasized that "the convention sets up the minimum standards of international judicial assistance which each country which ratifies the convention *must* offer to all others who ratify." S. Exec. Rep. No. 6, at 13 (statement by Philip W. Amram) (emphasis in original). Then-Secretary of State Rusk reiterated the same point,[3] as did the State Department's Deputy Legal Advisor,[4] and President Johnson.[5] The repeated references to "due process" were not, of course, intended to suggest that every contracting nation submitted itself to the intricacies of our constitutional jurisprudence. Rather, they were shorthand formulations of the requirement, common to both due process and the Convention, that process directed on a party abroad should be designed so that the documents "reach the addressee in due time," 3 Actes et Documents 367 (translation).

The negotiating history and the uniform interpretation announced by our own negotiators confirm that the Convention limits a forum's ability to deem service "domestic," thereby avoiding the Convention's terms. Admittedly, the Convention does not precisely define the contours. But that imprecision does not absolve us of our responsibility to apply the Convention mandatorily, any more than imprecision permits us to discard the words "due process of law," U. S. Const., Amdt. 14, § 1. And however difficult it might be in some circumstances to discern the Convention's precise limits, it is

---

[3] See S. Exec. Doc. C, at 8 ("[T]he convention . . . *requires* . . . major changes, in the direction of modern and efficient procedures, in the present practices of many other" nations) (emphasis added).

[4] See S. Exec. Rep No. 6, at 7 ("It is to our great advantage to obtain *binding commitments* from other governments that they will adhere to [the] principles" embodied in due process) (statement by Richard D. Kearney) (emphasis added).

[5] See S. Exec. Doc. C, at 1 ("[T]he convention makes important changes in the practices of many civil law countries, moving those practices in the direction of our generous system of international judicial assistance and our concept of due process in the service of documents").

remarkably easy to conclude that the Convention does not prohibit the type of service at issue here.   Service on a wholly owned, closely controlled subsidiary is reasonably calculated to reach the parent "in due time" as the Convention requires.   See, *e. g.*, 9 W. Fletcher, Cyclopedia of Law of Private Corporations § 4412, p. 400 (rev. ed. 1985).   That is, in fact, what our own Due Process Clause requires, see *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U. S. 306, 314–315 (1950), and since long before the Convention's implementation our law has permitted such service, see, *e..g.*, *Perkins* v. *Benguet Consolidated Mining Co.*, 342 U. S. 437, 444–445 (1952); *Latimer* v. *S/A Industrias Reunidas F. Matarazzo*, 175 F. 2d 184, 185 (CA2 1949) (L. Hand, J.).   This is significant because our own negotiators made clear to the Senate their understanding that the Convention would require no major changes in federal or state service-of-process rules.[6] Thus, it is unsurprising that nothing in the negotiating history suggests that the contracting nations were dissatisfied with the practice at issue here, of which they were surely aware, much less that they intended to abolish it like they intended to abolish *notification au parquet*.   And since notice served on a wholly owned domestic subsidiary is infinitely more likely to reach the foreign parent's attention than was notice served *au parquet* (or by any other procedure that the negotiators singled out for criticism) there is no reason to interpret the Convention to bar it.

---

[6] In words reiterated by Secretary of State Rusk, the delegation observed that "[i]n its broadest aspects the convention makes no basic changes in U. S. practices."   S. Exec. Doc. C, at 20.   See also *id.*, at 8 ("The most significant aspect of the convention is the fact that it requires so little change in the present procedures in the United States") (letter of submittal of Secretary of State Rusk).   The delegation's head likewise repeatedly observed that the Convention "leaves our common-law due-process principles unaffected and unchanged."   S. Exec. Rep. No. 6, at 11.   See also *id.*, at 9 ("By our internal law . . . we already give to foreign litigants all that this convention would require us to provide"); *id.*, at 16 (Convention "requires no changes in our law of judicial assistance").

My difference with the Court does not affect the outcome of this case, and, given that any process emanating from our courts must comply with due process, it may have little practical consequence in future cases that come before us. But cf. S. Exec. Rep. No. 6, at 15 (statement by Philip W. Amram suggesting that Convention may require "a minor change in the practice of some of our States in long-arm and automobile accident cases" where "service on the appropriate official need be accompanied only by a minimum effort to notify the defendant"). Our Constitution does not, however, bind other nations haling our citizens into their courts. Our citizens rely instead primarily on the forum nation's compliance with the Convention, which the Senate believed would "provide increased protection (due process) for American Citizens who are involved in litigation abroad." *Id.*, at 3. And while other nations are not bound by the Court's pronouncement that the Convention lacks obligatory force, after today's decision their courts will surely sympathize little with any United States national pleading that a judgment violates the Convention because (notwithstanding any local characterization) service was "abroad."

It is perhaps heartening to "think that [no] countr[y] will draft its internal laws deliberately so as to circumvent the Convention in cases in which it would be appropriate to transmit judicial documents for service abroad," *ante*, at 705, although from the defendant's perspective "circumvention" (which, according to the Court, entails no more than exercising a prerogative not to be bound) is equally painful whether deliberate or not. The fact remains, however, that had we been content to rely on foreign notions of fair play and substantial justice, we would have found it unnecessary, in the first place, to participate in a Convention "to ensure that judicial . . . documents to be served abroad [would] be brought to the notice of the addressee in sufficient time," 20 U. S. T., at 362.