**LAFARGE CORPORATION, and Lafarge Midwest Incorporated, Plaintiffs,**

v.

**ALTECH ENVIRONMENTAL USA and Environnement, S.A., Defendants.**

No. 02–10117–BC.

United States District Court, E.D. Michigan, Northern Division.

Sept. 12, 2002.

Steven C. Kohl, Douglas R. Kelly, Howard & Howard, Bloomfield Hills, MI, for plaintiff.

Mark E. Straetmans, Berry, Moorman, Detroit, MI, Timothy K. McConaghy, Hardy, Lewis, Kay R. Butler, Birmingham, MI, for defendant.

### OPINION AND ORDER GRANTING MOTION TO DISMISS BY DEFENDANT, ENVIRONNEMENT, S.A.[1]

LAWSON, District Judge.

Defendant Environnement, S.A. (ESA) is a French corporation which manufactures chemical analyzing equipment used to detect industrial emissions for environmental monitoring purposes. ESA furnished its devices to its American subsidiary, co-defendant Altech Environmental USA Corp. (Altech), which incorporated them into a monitoring system which Altech installed at the plaintiffs' cement processing plant in Alpena, Michigan. When the system did not become operational on a timely basis, the plaintiffs, Lafarge Corporation and Lafarge Midwest, Inc. (collectively "Lafarge"), allegedly incurred fines and penalties imposed by the Michigan Department of Environmental Quality (MDEQ). Lafarge then brought suit against Altech in the Alpena County, Michigan Circuit Court for breach of contract

---

1. The Court acknowledges the valuable contribution and assistance of judicial intern Christopher J. Berry in completing this opinion.

and various express and implied warranties, and later amended its complaint to add ESA as a defendant. ESA removed the action to this Court on the basis of diversity jurisdiction, 28 U.S.C. § 1441(b), and has now filed a motion to dismiss alleging that service of process on it was defective, and this Court lacks personal jurisdiction over it. The parties presented their arguments through their respective counsel in open court on August 14, 2002 at which time the Court directed the filing of supplemental affidavits. Those affidavits have been received and the matter is now ready for decision. The Court finds that ESA's contacts with this forum are not sufficient under the Due Process Clause and Michigan's "long-arm statute" to permit the exercise of personal jurisdiction over it, and even if they were, Lafarge was obliged to effectuate service of process in accordance with the Hague Convention, which it failed to do. ESA's motion to dismiss, therefore, will be granted.

## I.

Lafarge Corporation and Lafarge Midwest, Maryland and Delaware corporations respectively, own and operate a cement plant in Alpena, Michigan. Altech is an Illinois corporation with its principal place of business in Chicago, Illinois. ESA is a French corporation with its principal place of business in France, and is the parent corporation of Altech.

Pursuant to the terms of a consent judgment with the MDEQ, Lafarge was ordered to monitor continuously hydrogen chloride emissions from its cement-making operations. There does not appear to have been a problem with hydrogen chloride emissions themselves, but rather with Lafarge's inability to provide the MDEQ with accurate readings of the emissions it released. Under the consent judgment, Lafarge must demonstrate to the MDEQ that the monitoring devices it installed generate valid data under established environmental protocols.

Altech manufactures emission-monitoring equipment by assembling components purchased from various suppliers. The equipment collects air samples from cement kilns, transports the samples via pipeline to analyzers in a ground-level structure, and provides continuous information as to air quality. ESA manufactures analyzers that were purchased by Altech as components in the overall emission-monitoring system sold to Lafarge. Altech purchases analyzers both from ESA and its competitors.

Lafarge contracted with Altech to provide the system. The contract does not mention ESA, and none of the warranties made therein mention ESA. Rather, per the contract, Altech warrants the system and installation as follows:

> System will meet the performance requirements of the approved MDEQ/Lafarge permit. In the event of nonconformance to this warranty, Altech agrees to fully reimburse Lafarge of expenses. All five units must be installed and operations, including certification by the MDEQ within 270 days after approval of the permit.

Purchase Order, Pl.'s Am. Compl. ex. B. The analyzers in question are designated as "MIRS 9000" type; they were manufactured in France by ESA, and are marketed in the United States by ESA and Altech.

The purchase order between Lafarge and Altech is dated April 28, 2000, and Altech commenced system installation shortly thereafter. The installation process was completed in approximately November 2000, but the system did not generate the data which the MDEQ demanded. According to ESA's financial manager, several months later ESA sent

its technicians to the plaintiffs' Aplena plant to repair the system.

According to the plaintiffs, the monitoring system only recently became fully operational; from November, 2000 until February, 2002, it could not gather the information the MDEQ required. The MDEQ allegedly maintains it should have been operational sooner and has assessed over $1 million in fines against Lafarge at a rate of $10,000 per day. Lafarge now seeks indemnification for any amounts it may be ordered to pay MDEQ, including costs and attorney fees.

Altech was founded in 1989 and in approximately 1991 or 1992 was sold to the Wheelabrator division of Waste Management. ESA acquired an ownership interest in Altech in 1997 after Altech was sold to U.S. Filter in mid–1996, which in turn promptly resold Altech's air-measuring operations to ESA. Altech and ESA maintain separate leadership under their own boards of directors. They share three directors between them: Daniel Moulene, a director of Altech, is one of ESA's Vice Presidents; Francois Gourden, a director and one of Altech's Vice Presidents, serves as Chairman and President of ESA; and Christophe Chevillion, a director and one of Altech's Vice Presidents, serves as the Chief Executive Officer of ESA.

Altech does not have authority to enter contracts for or on behalf of ESA. The companies maintain separate accounting systems, although Altech sends ESA a monthly financial and business report. ESA has provided a loan to Altech which is being repaid with interest. ESA does not otherwise finance Altech's daily operations. Approximately 2.1% of ESA's revenues result from sales to Altech. ESA reviews Altech's performance, but does not control, direct, or actively become involved in Altech's marketing, pricing, or distribution practices. ESA does not pay the salaries or wages of any Altech employees.

ESA does not control or direct the daily operations of Altech.

ESA is not a registered corporation in Michigan, does not own any real or personal property in the state, lacks a resident agent or office, has no sales representatives or employees, has no telephone numbers or bank accounts, has not filed suit in a Michigan court, conducts no direct advertising in Michigan, and does not derive any revenues from direct sales to any companies in the State of Michigan.

ESA sold emission-monitoring equipment including analyzers to Altech in Chicago, Illinois and then shipped the equipment to Altech in Illinois. Altech then incorporated the equipment into the continuous-monitoring emissions system that subsequently was sold to Lafarge in Michigan.

When ESA technicians came to Alpena, Michigan to repair the system in July 2001, they installed a modem line to connect its French operations with the analyzers. The analyzers apparently are programmed with methods proprietary to ESA. ESA also shipped a number of replacement and prototype parts, including additional MIRS units, directly to Lafarge's plant in Alpena, Michigan so that such parts could be used in the efforts to diagnose and remedy the problems with the system. Except for these limited shipments, all equipment was sent directly to Altech in Chicago, Illinois. ESA forwarded an invoice to Altech for the services provided by ESA's technicians.

This case was filed in Alpena County Circuit Court on June 19, 2001. The complaint alleged breach of express warranty, breach of implied warranty of merchantability, breach of implied warranty of fitness for a particular purpose, breach of contract, and incidental and consequential damages. Pursuant to an order of the state court, Lafarge filed a first amended

complaint adding ESA as a defendant and adding a count seeking to pierce the corporate veil for abuse of the corporate form so that Lafarge could hold ESA accountable for the contractual breaches of its subsidiary.

Lafarge subsequently filed a motion for alternative service, seeking to achieve service on ESA through Altech. On March 5, 2002, the state court issued an order allowing Lafarge to "make service upon Altech as agent of ESA for purposes of receiving process." Service was made in this manner on or about April 1, 2002, and ESA then removed the case to this Court.

## II.

### A.

ESA argues first that it has no connection with Michigan which would justify it having to litigate this dispute here. It states that its involvement in the transaction is limited to supplying component parts to a separate corporation in Illinois. ESA argues that simply releasing a product into the stream of commerce without purposefully directing it toward the forum state is insufficient to result in "purposeful availment" of the privilege of acting there, citing *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102, 115, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). ESA further contends that its act of sending its technicians to Michigan to perform repairs occurred after the alleged breaches of warranty and contract occurred, and that these acts do not constitute the "minimum contacts" with this forum necessary to permit the Court's exercise of personal jurisdiction over it. The plaintiffs argue that ESA manufactured the components of the monitoring system to Lafarge's customized specifications and market those components through Altech, which merely served as its domestic sales agent. Accordingly, ESA should be deemed to have conducted business in Michigan. Moreover, ESA's post-installation activity of sending technicians and shipping parts to Lafarge's Alpena plant, together with the installation of a modem line to monitor emissions, constitutes sufficient minimum contacts with the forum to satisfy due process and the long-arm statute's requirements.

Personal jurisdiction over a parent company does not arise merely because the forum state properly asserts jurisdiction over one of its subsidiaries. *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1273–74 (6th Cir.1998). The analysis must focus on what the parent corporation has done, not its subsidiary. *Id.* at 1274. Furthermore, unless the plaintiff clearly shows otherwise, the Court will presume that companies holding themselves out as parent and subsidiary are in fact separate entities. *Id.* at 1273–74.

The plaintiffs, therefore, have the burden of proving the Court's jurisdiction over this defendant. *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir.2002). Because this Court is relying only on the pleadings and affidavits of the parties, the plaintiff "need only make a prima facie showing of jurisdiction." *Id.* In the absence of an evidentiary hearing, the "court will not consider facts proffered by the defendant that conflict with those offered by the plaintiff." *Id.* The Court views the facts in the light most favorable to the nonmoving party. *Serras v. First Tenn. Bank Nat'l Ass'n.*, 875 F.2d 1212,-1214 (6th Cir.1989).

"In a diversity case, personal jurisdiction must be appropriate both under the law of the state in which the district court sits and the Due Process Clause of the Fourteenth Amendment." *Bagsby v. Gehres*, 195 F.Supp.2d 957, 961 (E.D.Mich. 2002) (citing *Neogen Corp.*, 282 F.3d at 888). In Michigan, jurisdiction over the person can exist on the basis of general

personal jurisdiction, *see* Mich. Comp. Laws §§ 600.701 and 600.711, or limited personal jurisdiction, *see* Mich. Comp. Laws §§ 600.705 and 600.715. General personal jurisdiction exists over any corporation that is incorporated in Michigan, consents to jurisdiction, or engages in continuous and systematic business in Michigan. Mich. Comp. Laws § 600.711. Limited personal jurisdiction may be exercised over a defendant who has certain minimum contacts with the forum, but only over claims which arise from or relate to those contacts. *Theunissen v. Matthews*, 935 F.2d 1454, 1460 (6th Cir.1991). However, even a single contact with the forum state may suffice for personal jurisdiction if it is directly and substantially related to the plaintiff's claim. *Red Wing Shoe Co., Inc. v. Hockerson Halberstadt, Inc.*, 148 F.3d 1355, 1359 (Fed.Cir.1998).

■ The plaintiffs do not contend that ESA is subject to general personal jurisdiction in Michigan. However, Michigan's "long arm statute" contains a list of activities that will subject a corporation to the exercise of limited personal jurisdiction by Michigan courts. It includes transacting "any" business within the state, doing an act or causing consequences to occur in Michigan, owing or using tangible personal property in the state, insuring a risk within the state, and entering into a contract for services or materials within the state. Mich. Comp. Laws. § 600.715. Once the provisions of the long-arm statute are deemed met, the Court then determines whether an assertion of jurisdiction over the defendants would comport with the notions of fundamental fairness required by the Due Process Clause. *Cole v. Mileti*, 133 F.3d 433, 436 (6th Cir.1998). The Court determines compliance with the Due Process Clause under the following test:

First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a conse-

quence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Neogen*, 282 F.3d at 890 (quoting *Southern Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir.1968)). "Purposeful availment" occurs when "the defendant's contacts with the forum state proximately result from actions by the defendant *himself* that create a substantial connection with the forum State." *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). "This purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.'" *Id.* On the other hand, "parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King*, 471 U.S. at 473, 105 S.Ct. 2174 (citations omitted).

The plaintiffs correctly point out that ESA's business dealings in Michigan need not be extensive or prolonged, since the Michigan statute allows "any" business dealings to suffice, and "any" includes even the slightest amount. *See Sifers v. Horen*, 385 Mich. 195, 199 n. 2, 188 N.W.2d 623, 624 n. 2 (1971). The Michigan Court of Appeals has broadly defined the concept of transacting business:

The phrase "transaction of any business" is not defined in the statute. Therefore, it is proper to rely on dictionary definitions in determining the

meaning of that provision. *Popma v. Auto Club Ins. Ass'n*, 446 Mich. 460, 470, 521 N.W.2d 831 (1994). "Transact" is defined as "to carry on or conduct (business, negotiations, etc.) to a conclusion or settlement." *Random House Webster's College Dictionary* (1997). "Business" is defined as "an occupation, profession, or trade ... the purchase and sale of goods in an attempt to make a profit."

*Oberlies v. Searchmont Resort, Inc.*, 246 Mich.App. 424, 430, 633 N.W.2d 408, 413 (2001) (holding that extensive marketing efforts directed toward Michigan consumers satisfied Mich. Comp. Laws § 600.715(1)).

As noted above, however, the plaintiffs' cause of action must also arise from the business transacted in the forum. The Court of Appeals addressed this component of the test in *Lanier v. American Board of Endodontics*, 843 F.2d 901, 908–09 (6th Cir.1988). There, a female plaintiff sued the Illinois-based American Board of Endodontics, alleging that she was denied a license by the Board on the basis of gender. The Board filed a motion to dismiss, arguing that it had insufficient minimum contacts with the State of Michigan. The Court of Appeals disagreed. First, the Court found that the Board had transacted business within Michigan by exchanging correspondence and telephone calls with the plaintiff, in addition to collecting her application fee. Second, the Court found that the plaintiff's cause of action arose out of those business transactions. Two possible theories defining the "arising from" requirement were considered: one was whether the business transactions "made possible" the cause of action, and the other was whether the cause of action arose in the "wake" of the business transactions. Under either theory, the Court held that the discrimination was made possible and occurred in the wake of the plaintiff's filing her application, which the Court had previously found to constitute the transaction of business in Michigan by the Board. *Lanier*, 843 F.2d at 908.

■ · The plaintiffs' claims in this case arise from the failure to install a monitoring system that accurately collected the data required by the MDEQ. There can be little question but that the sale and installation of the system constituted the transaction of business in Michigan, but the sales contract was between Lafarge and Altech, not ESA. Lafarge has furnished no evidence that Altech served as ESA's sales agent or acted in a way that compromised its corporate independence from its parent, or that it participated in the initial installation of the system. Based on the information presently before the Court, ESA's involvement in the transaction was nothing more than supplying component parts to the party that contracted to install the completed system-activity that, by itself, does not constitute transacting business with the ultimate purchaser for the purpose of personal jurisdiction. "[A] defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State." *Asahi*, 480 U.S. at 112, 107 S.Ct. 1026. There is no evidence that ESA's components were designed specifically for the Michigan market. And although ESA maintains a website in English, presumably for U.S. customers, that alone will not constitute "purposeful availment." *Neogen Corp.*, 282 F.3d at 890 (defendant purposefully avails itself of privilege of acting in a state through its website only if website is interactive to a degree that reveals specifically intended interaction with residents of the state).

ESA did conduct business in Michigan when it performed repairs at the Lafarge

site. The fact that ESA billed Altech instead of Lafarge does not mean business was not conducted in Michigan. Such conduct could fairly be considered "carrying on ... an occupation, profession, or trade," *Oberlies*, 246 Mich.App. at 430, 633 N.W.2d at 413, that constitutes purposeful availment of the benefits of doing business in a Michigan forum. ESA performed services in Michigan and did so for monetary gain. ESA's installation of a modem line after the sale to monitor the status of the analyzers is the type of conduct that *Burger King* contemplated with it counseled that purposeful availment would occur when "parties ... reach out beyond one state and create continuing relationships and obligations with citizens of another state." *Burger King*, 471 U.S. at 473, 105 S.Ct. 2174.

However, these contacts all occurred after the contract had been executed and the purchased equipment installed. In Michigan, a cause of action for breach of contract arises when the breach occurs, not when the injury is discovered. *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1133 (6th Cir.1995). ESA sent its technicians and shipped replacement parts to Aplena in order to perform repairs. If the plaintiffs alleged that those repairs were performed negligently, then personal jurisdiction against ESA might lie. But the gravamen of Lafarge's claim is the breach of the contract of sale and violation of various express and implied warranties-promises all made and allegedly broken before ESA arrived on the scene. The plaintiff's cause of action simply cannot be said to have "arisen from" or lie in the "wake" of ESA's contacts. *See Lanier*, 843 F.2d at 909. ESA's contacts with this forum are insufficient under both the Due Process Clause and Michigan's long-arm statute.

The Court concludes, therefore, that the plaintiffs have not carried their burden of establishing this Court's limited personal jurisdiction over ESA.

## B.

Although the Court concludes that no personal jurisdiction exists over ESA in this case, the Court will address ESA's argument that it was not properly summoned before the Court. Lafarge obtained an order from the state court for alternate service of process and served the summons issued to ESA on Altech. ESA contends that Michigan's process rules require that papers actually be delivered in some fashion to the corporate defendant, thereby invoking a requirement that the Hague Convention provisions be followed to bring an alien foreign corporation before the Court. Lafarge contends that its method of service provided actual notice, which is all that the Michigan rule requires, and was therefore sufficient.

In 1969, the Hague Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361, went into force. The convention is a multilateral treaty designed to streamline the process of serving defendants situated abroad and to ensure that foreign defendants receive proper notice of suits filed against them in other countries. *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 698, 108 S.Ct. 2104, 100 L.Ed.2d 722 (1988). Both the United States and France are signatories to the convention. *Eli Lilly & Co. v. Roussel Corp.*, 23 F.Supp.2d 460, 470 n. 13 (D.N.J.1998). The Convention requires that each signatory nation establish a central authority either to promulgate rules for direct service upon local parties or to receive process itself and forward the service onto the appropriate party. *Schlunk*, 486 U.S. at 698–99, 108 S.Ct. 2104.

■ Because the Hague Convention is a treaty, the Supremacy Clause preempts any inconsistent state law. *Schlunk,* 486 U.S. at 699, 108 S.Ct. 2104. By its terms, the Convention "shall apply in all cases, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad." 20 U.S.T. at 362. However, the Convention does not define what constitutes legally sufficient service of process; accordingly, that determination is governed by the internal law of the forum state. *Schlunk,* 486 U.S. at 700, 108 S.Ct. 2104. "If the internal law of the forum state defines the applicable method of serving process as requiring the transmittal of documents abroad, then the Hague Service Convention applies." *Id.* In *Schlunk,* the plaintiff successfully avoided the need for foreign service upon the defendant, who resided in Germany, by taking advantage of an Illinois statute that permitted foreign companies to be served involuntarily through any resident subsidiary. *Id.* at 707, 108 S.Ct. 2104. The fact that the documents necessarily would be transmitted overseas after service was deemed immaterial. *Id.*

Michigan law does not have a similar provision. Rather, it provides that corporations must be "personally" served. The applicable Rule states:

> Service of process on a domestic or foreign corporation may be made by
>
> (1) serving a summons and a copy of the complaint on an officer or the resident agent;
>
> (2) serving a summons and a copy of the complaint on a director, trustee, or person in charge of an office or business establishment of the corporation and sending a summons and a copy of the complaint by registered mail, addressed to the principal office of the corporation;
>
> (3) serving a summons and a copy of the complaint on the last presiding officer, president, cashier, secretary, or treasurer of a corporation that has ceased to do business by failing to keep up its organization by the appointment of officers or otherwise, or whose term of existence has expired;
>
> (4) sending a summons and a copy of the complaint by registered mail to the corporation or an appropriate corporation officer and to the Michigan Corporation and Securities Bureau if
>
> (a) the corporation has failed to appoint and maintain a resident agent or to file a certificate of that appointment as required by law;
>
> (b) the corporation has failed to keep up its organization by the appointment of officers or otherwise; or
>
> (c) the corporation's term of existence has expired.

Mich. Ct. R. 2.105(D). The Rule also provides an alternative method of service for defendants who cannot be served through the preferred methods outlined above: "On a showing that service of process cannot reasonably be made as provided by this rule, the court may by order permit service of process to be made in any other manner reasonably calculated to give the defendant actual notice of the proceedings and an opportunity to be heard." Mich. Ct. R. 2.105(I)(1). Also of note is subsection (J), which provides a catch-all, savings clause in the event that service is improper, but actual notice is still received: "An action shall not be dismissed for improper service of process unless the service failed to inform the defendant of the action within the time provided in these rules for service." Mich. Ct. R. 2.105(J). However, under Rule 4 of the Federal Rules of Civil Procedure, the procedures governing the *manner* of service (as opposed to the form of service) are construed strictly. *See Mid–Continent Wood Prods., Inc. v. Harris,* 936 F.2d 297, 300–01 (7th Cir.1991). *See also Friedman v. Estate of Presser,*

929 F.2d 1151, 1155–56 (6th Cir.1991) (reiterating that actual notice is no substitute for personal service of process). Where Rule 4 and the service of process provisions of a state conflict, Rule 4 controls. *Hanna v. Plumer*, 380 U.S. 460, 463–65, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965).

■ By requiring service on a corporate officer or principal office of the corporation, the Michigan Rule can fairly be said to contemplate "transmit[al of] a judicial … document for service abroad," thereby requiring application of the terms of the Convention. Lafarge contends that the state court order entered under Mich. Ct. R. 2.105(I) excuses the requirement of personal service. However, subsection (I) states that it only applies "[o]n a showing that service of process cannot reasonably be made as provided by this rule," and no explanation has been provided for the failure to comply with subsection (D). Thus, Lafarge cannot use subsection (I) to circumvent the mandate of subsection (D), which effectively requires the service of documents abroad and therefore implicates the Hague Convention.

No provision within Rule 105 allows service on a parent corporation to be achieved by delivery of process to its subsidiary. In fact, under Michigan law, "[i]t is a well recognized principle that separate corporate entities will be respected." *Seasword v. Hilti, Inc.*, 449 Mich. 542, 547, 537 N.W.2d 221, 224 (1995).

Lafarge acknowledges that it did not follow the requirements of Rule 105(D) or the Hague Convention. It therefore failed to properly summon ESA before the Court because of the insufficiency of service of process. Although dismissal of the action on this ground might be warranted in some circumstances, normally the Court would quash service and allow the plaintiff to attempt proper service. *See Umbenhauer v. Woog*, 969 F.2d 25, 30 (3d Cir. 1992). The Court's ruling that it lacks personal jurisdiction over ESA with respect to this dispute, however, renders unnecessary the need to fashion a remedy.

### III.

Because the Court does not have personal jurisdiction over defendant ESA, the action cannot proceed against that defendant.

Accordingly, it is **ORDERED** that the motion to dismiss by defendant, Environnement, S.A. [dkt # 6] is **GRANTED** and the amended complaint is dismissed as to that defendant without prejudice.