Edwin Vazquez, Respondent, v Sund Emba AB, Appellant, et al., Defendant.

Second Department, December 11, 1989

### APPEARANCES OF COUNSEL

*Ahmuty, Demers & McManus (Henri A. Demers* of counsel), for appellant.

*Donner, Hariton & Berka, P. C. (Ira M. Hariton* of counsel; *Robert J. Zysk* with him on the brief), for respondent.

### OPINION OF THE COURT

ROSENBLATT, J.

We are asked to interpret provisions of the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters dated November 15, 1965 (hereinafter the Hague Convention or the Convention) (20 UST 361, TIAS 6638, 658 UNTS 163),[1] and their

---

1. The Hague Convention is reprinted in 28 USCA following Fed Rules Civ Pro, rule 4 and in VII Martindale Hubbell (part VII, at 1 [1989 ed]).

application to the plaintiff's service of process on a Swedish company.

■ The case comes to us by virtue of the motion of the defendant (hereinafter the appellant) Sund Emba AB to dismiss the complaint insofar as it is asserted against it for lack of in personam jurisdiction. The validity of the service of process and, hence, personal jurisdiction depends, for reasons which will follow, on whether service was effectuated in accordance with the Hague Convention. The Supreme Court denied the appellant's motion to dismiss, holding that pursuant to article 10 (c) of the Convention, the "plaintiff's personal service of the summons and complaint on [appellant] was sufficient service to give this court jurisdiction of the present dispute". We agree.

In his complaint, the plaintiff alleges that he was injured during the course of his employment in Farmingdale, New York, when his hand became caught in a corrugated box folding machine, allegedly manufactured by the appellant, a limited company organized under the laws of Sweden. The plaintiff's summons and complaint, written in English, was served by Anders Sandberg, a Swedish notary public, personally upon the appellant's managing director Erik Sjunnesson at the appellant's facility in Orebro, Sweden.

Suits involving parties in different countries present special problems relating to procedure under international law. The means by which a party may be subjected to the jurisdiction of the courts of another country goes to the very heart of national sovereignty and international political sensibilities. In this arena, one of the most vexing problems has involved the acquisition of jurisdiction, in the context of service or delivery of process, and the underlying issues of notice and fairness.

The declarations of the Hague Convention were the result of negotiations in which the signatory States, including Sweden and the United States, fashioned and adopted various procedures designed to deal with the service of documents from abroad. In order to better understand the declarations and provisions, it is appropriate to examine the history of the treaty, its purpose, its development, and the extent to which signatory States intended to retain or alter practices that they employed before they joined the Convention (see, Volkswagen-werk AG. v Schlunk, 486 US 694, 699-700).

On February 10, 1969, the Hague Convention became effec-

tive with respect to the United States. For Sweden it became effective on October 1, 1969 (Kluwer, Practical Handbook on the Operation of the Hague Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, at 124 [1983] [hereinafter cited as Handbook]). It was the first multilateral treaty on international judicial procedure which the United States ever joined (Boyd, *Contemporary Practice of the United States Relating to International Law,* 72 Am J Intl L 119, 130-131 [1978]).

The Convention was designed to establish a regime "for the effective, expeditious and inexpensive service of legal documents abroad" *(Reports on Work of Special Commission on Operation of Hague Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters: Report of the U.S. Delegation to Special Commission,* 17 Intl Legal Materials 312 [1978]). Although the first meetings of the Hague Conference began in 1893, and by 1909 had 16 European States as members, the interruptions of two world wars prevented its expansion to a wider economic international community (9 Encyclopedia of Pub Intl Law, Hague Conventions on Civil Procedure, at 147, 148).

In the postwar period of the 1950's, international commerce burgeoned, and American analysts believed that international procedures for settling commercial disputes were in need of modernization (Commission on International Rules of Judicial Procedure—Establishment, 1958 US Code Cong & Admin News 5201), so that in 1956 the United States, for the first time, sent an observer delegation to the Conference (Downs, *The Effect of Hague Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters,* 2 Cornell Intl LJ 125, 126 [1968] [hereinafter cited as Downs]). Shortly thereafter the United States Congress passed legislation authorizing the creation of a commission to investigate and improve upon practices in international juridical relationships, with the result that President Johnson, in 1963, signed a resolution authorizing American participation in the Hague Conference (Downs, *op. cit.,* at 127-128). At the heart of the matter was a quest for harmony and procedural efficiency in a setting confounded by widely divergent practices and varying notions relating to jurisdiction. As described by the Commission itself: "courts in the United States operate under the general principles of the Anglo-American common-law system and other countries of Latin America and continental Europe

operate under various modifications of the civil-law system. The civil-law system has as its basis the ancient system of Roman law and the Code Napoleon * * * [T]here are those countries which operate under Islamic law, and newly created countries such as Indonesia, India, Pakistan, Burma, and Israel which have adopted procedural systems which are a combination of several different systems" (Commission on International Rules of Judicial Procedure, *op. cit.*, at 5202).

During the early stages of American participation in the Convention, the member States were focusing on the issues of international service of legal documents, with the result that the Convention undertook to refine and codify appropriate procedures, and to meet periodically to draft conventions affecting problems between member Nations (Downs, *op. cit.*, at 126-127).

As for service of process, the governing provision that emerged from the Hague Convention was that "[e]ach contracting State shall designate a Central Authority which will undertake to receive requests for service coming from other contracting States" (Convention art 2). Upon receiving a request, the Central Authority must serve the document, or arrange to have it served by "an appropriate agency", either by a method prescribed by the internal law of the receiving State,[2] or by a method designated by the requester, if compatible with the law of the receiving State (Convention art 5).

It is noteworthy that while the member States contemplated a uniform procedure by conceiving of a Central Authority within each State, they also determined that the States should be free to consent to additional methods of service within their borders, consonant with their own laws (arts 8-11, 19).

Article 10, which is at the core of this case, provides as follows:

"Provided the State of destination does not object, the present Convention shall not interfere with—

"(a) the freedom to send judicial documents, by postal channels, directly to persons abroad,

"(b) the freedom of judicial officers, officials or other competent persons of the State of origin to effect service of judicial

---

2. "For examples of how neighboring countries can have very different methods for serving process, *see Service of Process in Austria, England, Italy, and West Germany,* 9 Intl Law 689 (1975)" (Horlick, *A Practical Guide to Service of United States Process Abroad,* 14 Intl Law 637, 640, n 13).

documents directly through the judicial officers, officials or other competent persons of the State of destination.

"(c) the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination".

In ratifying the Convention, most States, including Sweden, made various declarations reflective of their own sense of sovereignty,[3] in which they set forth objections or requirements with respect to certain methods of service.

Sweden signed the Convention with the following declaration:

"a) The Ministry of Foreign Affairs (address: Utrikesdepartementet, Juridiska byran, Box 16121, S-103 23 Stockholm 16, Sweden) has been designated Central Authority.

"b) The Central Authority (the Ministry for Foreign Affairs) has been designated to receive documents transmitted through consular channels, pursuant to art. 9.

"c) *Swedish authorities are not obliged to assist in serving documents transmitted by using any of the methods referred to in sub-paragraphs (b) and (c) of art. 10.*

"By virtue of the third paragraph of art. 5 of the Convention the Central Authority requires that any document to be served under the first paragraph of the same article must be written in or translated into Swedish" (Convention, Sweden declarations [emphasis supplied]).

The appellant argues that the method of service used by the plaintiff is incompatible with this declaration. Specifically, the appellant claims that Sweden's declaration italicized above must be interpreted as that State's objection to personal service of foreign documents except by the Central Authority. The appellant further contends that, in any event, service was improper because a Swedish translation of the summons and complaint was not provided.

▮ Initially, the parties acknowledge, as do we, that compli-

---

**3.** For example, the only form of service from abroad permitted by Switzerland is the use of letters rogatory. "The Swiss position is based on an extreme view of the nature of sovereignty, whereby any act touching Switzerland, including mailing of service *into* Switzerland from the United States, is viewed by Switzerland as a judicial act by the United States *within* Switzerland, thereby invading Swiss sovereignty" (Horlick, *A Practical Guide to Service of United States Process Abroad,* 14 Intl Law 637, 641 [emphasis in original]).

ance with the Convention is mandatory in all cases to which it applies, and that the law of the judicial forum (here, New York) determines whether or not service of process abroad is necessary *(Volkswagenwerk AG. v Schlunk,* 486 US 694, 700, *supra).* "Where service on a domestic agent is valid and complete under both state law and the Due Process Clause, our inquiry ends and the Convention has no further implications" *(Volkswagenwerk AG. v Schlunk, supra,* 486 US, at 707).[4] Here, although the plaintiff alleged that the appellant was doing business in New York at all relevant times, neither party argues that service in this country was, or could have been, made. The parties therefore implicitly concede that service abroad, pursuant to the Convention, was the only proper means of service.

■ We hold that Sweden plainly contemplated service pursuant to the methods referred to in article 10 (b) and (c) (i.e., personal service) and that the restrictive language in subdivision (c) of its declaration simply means that Swedish authorities are not constrained to aid in such service. Had Sweden been opposed to any method of service pursuant to article 10, it could have, and we infer, would have expressly objected, as did, for example, Norway and Denmark, as well as Botswana, Germany, Japan and Turkey.

---

4. Therefore, "if state law, consistent with federal and state due process laws, permits domestic service upon a domestic subsidiary, the Convention does not apply" (Carlisle, *1988 Survey of New York Law—Civil Practice,* 40 Syracuse L Rev 77, 109 [1989]). Pursuant to Business Corporation Law § 306, one may serve foreign corporations licensed to do business in New York by delivering two copies of the process to the Secretary of State as agent for the corporation. Service is complete when the Secretary is so served (Business Corporation Law § 306 [b]). The Secretary then sends a copy of the process to the corporation. " 'The jurisdictional act is the delivery of the two copies to the Secretary. The latter's failure to forward one to the corporation does not void the service.' *A fortiori,* if the Secretary transmits the process to the foreign corporation abroad in some manner that violates the Convention, personal jurisdiction over the defendant would still exist" (Committee on Federal Courts of the New York State Bar Association, *Service of Process Abroad: A Nuts and Bolts Guide,* 122 FRD 63, 73, quoting Siegel, NY Prac § 70, at 75, n 9 [1978], citing *Micarelli v Regal Apparel,* 52 AD2d 524). However, pursuant to Business Corporation Law § 307, one may serve unlicensed foreign corporations which are subject to jurisdiction under CPLR article 3 by delivering a copy of the process to the Secretary of State as agent for the corporation, and then personally delivering or mailing notice of that service and a copy of the process to the corporation. The transmittal to the foreign corporation must be in accordance with the Convention *(Rissew v Yamaha Motor Co.,* 129 AD2d 94; *Reynolds v Woosup Koh,* 109 AD2d 97; *Low v Bayerische Motoren Werke, AG.,* 88 AD2d 504).

This interpretation is consistent with Sweden's pre-Convention policies regarding service of foreign documents. Prior to the 1965 Convention, a Swedish decree based on the 1905 Hague Convention, to which Sweden was a signatory, permitted various modes of service *("delgivning"),* including personal service of documents *("personlig delgivning")* by authorized process servers *("stamningsmannadelgivning"),* in response to requests by foreign authorities (Ginsburg, Civil Procedure in Sweden, 230, 231, 234 [1965]). The decree, however, only regulated the assistance made available when Swedish authorities were involved, thereby leaving a party free to lawfully effectuate personal service, if possible, without the help of Swedish authorities. "As to civil cases, neither legislation nor official policy restrict[ed] service of foreign judicial documents on persons within Sweden by foreign representatives ([f]or example, foreign diplomatic or consular officials, or officers commissioned to act on behalf of a foreign court) or private persons ([f]or example, the parties, their representatives, or a private Swedish attorney) without the assistance of Swedish authorities" (Ginsburg, Civil Procedure in Sweden, at 407, nn 78, 79 [1965]).

The plaintiff draws our attention to a publication of the United States Department of State. It is a "general guideline" and advises that service of process in Sweden may be accomplished by sending the documents and appropriate forms to the Swedish Central Authority, but that such procedure "need not be used" and that "[a]ny private person may serve process in Sweden. An agent or a Swedish attorney could also be hired to do so". Although the State Department guideline lacks the force of law and is not controlling on this court, we recognize it to the extent that it reflects the State Department's advice to practitioners, based on an interpretation of Swedish law, furnished primarily by the Swedish Ministries of Foreign Affairs and Justice in 1981 to the American Embassy in Stockholm.

As the appellant does not claim that Anders Sandberg, the Swedish notary public who served the summons and complaint upon it, was otherwise not qualified under Swedish law to make such service, we conclude that the summons and complaint were delivered personally to the appellant's agent in accordance with the Hague Convention and Sweden's declarations.

The appellant argues that even if the method of service used by the plaintiff was proper, the failure to translate the

summons and complaint into Swedish violates Sweden's translation requirement under the Hague Convention.

■ The appellant's contention with respect to Sweden's translation requirement is implausible. Initially, we note that translation is not a necessary element of all methods of service pursuant to the Convention. Article 5 states that "If the document is to be served under the first paragraph above [subparagraph (a)], the Central Authority may require the document to be written in, or translated into, the official language or one of the official languages of the State addressed."[5] It therefore gives the Central Authorities of the signatory Nations the right to require translations with respect to service pursuant to article 5 (a). As previously noted, Sweden, in its declaration stated: "By virtue of the third paragraph of art. 5 of the Convention the Central Authority requires that any document to be served under the first paragraph of the same article must be written in or translated into Swedish". However, the Convention provides no right to require translation of a document where service is made by the Central Authority "by a particular method requested by the applicant" pursuant to article 5 (b) (1 Ristau, International Judicial Assistance [Civil and Commercial] § 4-17, at 149-150 [1984 and 1 Supp (1986)]). Moreover, where, as here, the Central Authority is not involved in the service of a particular document, the translation requirement is not triggered at all (see, Lemme v Wine of Japan Import, 631 F Supp 456, 464).

Sweden's declaration clearly imposes no translation requirement where its Central Authority is not involved in the service[6] (see, Handbook, op. cit., at 78, where the only translation requirement noted relates to Convention art 5 [a]).

The conclusion that Sweden does not require translations of foreign documents that are not served pursuant to article 5 (a) comports with Sweden's traditional policies regarding translation. Historically, Sweden did not require translation of for-

5. Convention article 5 (a) provides that "The Central Authority of the State addressed shall itself serve the document or shall arrange to have it served by an appropriate agency * * * by a method prescribed by its internal law for the service of documents in domestic actions upon persons who are within its territory".

6. We need not and do not decide whether Sweden, compatibly with the Convention, could have required translation of documents served by means independent of the Central Authority, such as by personal service by notary public, as was effectuated here.

eign documents served in that country. Rather, Sweden required only that, if and when Swedish authorities were called upon to effect service, the *request* to Swedish authorities be translated. For example, Swedish authorities, pursuant to a special provision applicable to States adhering to either the 1905 or the 1954 Hague Convention,[7] would honor requests for service of foreign documents. That provision contains Sweden's requirement that the request for service, as opposed to the document itself, be translated into the Swedish, Danish, or Norwegian language (Ginsburg, Civil Procedure in Sweden, at 409, n 98 [1965]).

Although we conclude that the requirements of service pursuant to the Convention are satisfied, one more point, while not raised by the appellant, is worth mentioning. Even though the Convention has been strictly followed, our own standards of due process require that the method of service be reasonably calculated, as a matter of fair play, to give actual notice to a prospective party abroad (Horlick, *A Practical Guide to Service of United States Process Abroad,* 14 Intl Law 637, 647). Failure to provide a translation may, in some instances, constitute a denial of due process *(see, e.g., Julen v Larson,* 25 Cal App 3d 325, 101 Cal Rptr 796). However, in this case, in support of its motion to dismiss, the appellant submitted two affidavits of its service manager, Gosta Muhlbach. Those affidavits, which were on the appellant's letterhead containing preprinted English words, were written in English, and notarized in English. United States courts have refused to invalidate service where the defendant is a multinational corporation whose representatives have demonstrated an ability to deal in English, and the defendant is attempting to invalidate service on the grounds that the documents served should have been translated into the language of the country where served *(see, Hunt v Mobil Oil Corp.,* 410 F Supp 4, 9; *Shoei Kako Co. v Superior Ct.,* 33 Cal App 3d 808, 109 Cal Rptr 402).

We conclude that the failure to serve the appellant with a Swedish translation of the summons and complaint violates neither Sweden's own declaration nor the intent of the Convention, and does not offend concepts of fairness in the service

---

7. The 1954 Convention is still in force with respect to countries which have not adopted the 1965 Convention (1 Ristau, International Judicial Assistance [Civil and Commercial] § 4-3, at 120, n 2 [1984 and 1 Supp (1986)]).

of process upon the appellant. Accordingly, the order appealed from is affirmed, with costs.

MOLLEN, P. J., SPATT and SULLIVAN, JJ., concur.

Ordered that the order appealed from is affirmed, with costs.