OPINION OF THE COURT
Harold Tompkins, J.
Plaintiff seeks a preliminary injunction enjoining the defendants from removing or selling certain paintings presently in storage at the premises of defendant Cirker’s Hayes Storage Warehouse, Inc. The defendants cross-move to dismiss the complaint in three separate cross motions on grounds of lack of personal jurisdiction, failure to include necessary parties and on grounds of forum non conveniens. Plaintiff also moves for a default judgment against defendants Silverside Management, N. V. and Greenbranch, N. V. Plaintiff has informed the court that the action has been settled as against defendant Cirker’s Hayes Storage Warehouse, Inc. Therefore this defendant’s motion to dismiss is moot.
Defendants Alejandra (Torres) Arocena, Aurelio Torres and Claudio Torres are the children of plaintiff Cecilia Buzio De Torres and her late husband, Horacio Torres. Plaintiff claimed that, along with Alejandra’s husband, defendant Nicolas Arocena, they removed from plaintiff’s control secretly or against her wishes numerous valuable paintings either belonging to plaintiff, or which were left in her care by the rightful owners. Plaintiff moves to restrain the individual defendants, along with their companies, Silverside Management, N. V. and Greenbranch, N. V., from removing the paintings from their warehouse storage and, perhaps, out of the country, before plaintiff can establish her right to the property. A temporary restraining order is presently in effect.
Horacio Torres, plaintiff’s late husband, was one of the four children of Joaquin Torres-Garcia, a prominent modernist painter earlier in the century. Mr. Torres-Garcia, an Uruguayan national, died in Uruguay in 1949, leaving to his heirs a legacy which included numerous paintings, drawings and other works of art, which are purported to be of considerable value in the current art market. The distribution of his estate to his heirs is governed by Uruguay law of intestacy since he had no will.
Defendants’ legal expert, Dr. Eduardo Vaz Ferreira, asserts that under Uruguayan law of intestacy a distinction is made *54 between property owned by the decedent prior to his marriage, and property acquired during marriage. The surviving spouse is entitled to share with her children in the property acquired during the marriage, but not in the property acquired prior to the marriage, which is shared equally among the decedent’s surviving children. Thus, under these rules, an interest in the paintings of Joaquin Torres-Garcia was acquired upon his death, in varying percentages, by his surviving widow, Manolita Torres-Garcia, and his four children, Horacio, Olimpia, Augusto and Ifigenia.
The papers indicate that the heirs of Torres-Garcia cooperated in promoting and selling his works for many years. Both Horacio, also an artist, and plaintiff whom he married in 1960, acted as agents for the family in the sale of the artworks in New York, where plaintiff and Horacio lived from time to time, while maintaining a residence in Uruguay. Each of plaintiffs three children was born in Uruguay.
Horacio died in New York in 1976, also without a will. Plaintiff continued to promote and sell the works of Torres-Garcia, on behalf of herself and the family. In 1978 plaintiff, Manolita, and the surviving children of Torres-Garcia, Au-gusto, Olimpia and Ifigenia, entered into an agency agreement in which each acknowledged a purported one-fifth interest in the works of Torres-Garcia, and in which each of his three children and plaintiff agreed to act as agents for all of the other parties in the promotion and sale of the works. Significantly, this agreement was executed in Uruguay. It did not make any special provision for applying any other law to the agreement. No mention is made in it of any interest in the artworks which might be held by plaintiffs children, the grandchildren of Torres-Garcia and the children by his heir, Horacio Torres.
Plaintiff bases her alleged ownership interest in the paintings now held by defendants upon the claim of her husband Horacio under Uruguayan law, and the terms of the 1978 agreement. She claims that any interest her children might have in the paintings has been satisfied by the distribution of her husband’s estate, and by her right to dispose of the paintings, as guardian of her children at the time of the 1978 agreement.
This action is rendered unnecessarily complex by the existence of four orders to show cause and four temporary restraining orders. Understanding of the jurisdiction issues de *55 pends on an understanding of the events. Plaintiffs first order to show cause and temporary restraining order, signed by this court on May 31, 1991, called for service of the order to show cause, summons and complaint "upon each of the defendants personally * * * which delivery shall be effected on or before June 7, 1991.”
Plaintiff presented the court with a second order to show cause in July 1991 since she was unable to serve her sons Claudio and Aurelio. Alejandra and Nicolas, who had allegedly been served with the order to show cause and summons and complaint by substituted service in Uruguay, were already challenging the propriety of that service due, among other things, to plaintiffs alleged failure to comply with the terms of the 1975 Inter-American Convention on Letters Rogatory which they claim governs service in this case. This court signed the second order to show cause on July 19, 1991.
Plaintiffs third order to show cause was issued to "moot the question of adequacy of service” by permitting substitute service on plaintiffs children instead of the personal delivery required by the first order to show cause. As a result of this third order, signed August 2, 1991, plaintiff claims to have completed personal service upon her sons and upon Alejandra and Nicolas. Since defendants’ most recent papers in opposition to the motion, and in favor of dismissal of the complaint, address only the sufficiency of service upon Alejandra in Uruguay,[1] it appears that the defendants’ objections to service at this time relate only to Alejandra.[2]
Alejandra originally challenged the service of the first and second orders to show cause, and the summons and complaint, on the grounds that service had not been made upon her by personal "delivery” to her as the order required, but was instead served upon her housekeeper at her residence in Uruguay. She claimed that the service was otherwise in violation of CPLR 313 and the 1975 Treaty. Since the third order to show cause allowed for substituted service upon Alejandra which has evidently occurred, also at her residence in Uruguay, Alejandra ultimately relies on plaintiffs alleged failure to comply with the 1975 Treaty.
*56 The United States and Uruguay are both signatories to the 1975 Inter-American Convention on Letters Rogatory which was ratified by the United States in 1988 (TIAS No. 43, reprinted in Martindale-Hubbell Inti Law Digest, part VII, 1C-43 [1992]). Article 2 of the Convention states in pertinent part that it shall apply "to letters rogatory, issued in conjunction with proceedings in civil and commercial matters held before the appropriate judicial or other adjudicatory authority of one of the States Parties to this Convention, that have as their purpose: (a) The performance of procedural acts of a merely formal nature, such as service of process, summonses and subpoenas abroad”.
The Convention does not apply, by its terms, to "letters rogatory relating to procedural acts other than those specified (in article 2); and in particular it shall not apply to acts involving measures of compulsion” (art 3).
The Convention, in article 10, requires that all letters rogatory "shall be executed in accordance with the laws and procedural rules of the State of destination.” Defendants claim that the Treaty applies to the service of process upon Alejandra in Uruguay, and requires that service be made upon her in accordance to the requirements of Uruguayan law. The court is informed that the Uruguayan General Procedural Code (CGO), article No. 79.S provides that "At the request of the interested party and with the authorization of the court, notices may be served at the domicile of the defendant anywhere in the national territory, as provided for herein, through a notarial certificate issued by a notary public appointed by the party and at the party’s expense. The Supreme Court of Justice shall regulate the way in which such summons and notices are served.” Therefore, service of process under the 1975 Treaty within Uruguayan territory must be made with the “authorization of the court.” Concededly, plaintiff never obtained such authorization. The services of the orders to show cause, and the summons and complaint were therefore all deficient since plaintiff never sought or obtained the authorization of the Uruguayan judiciary prior to service, as required under Uruguayan law.
The language of the Inter-American Convention is mandatory, in that its terms “shall apply” to, among other things, the "service of process * * * abroad” (art 2). Thus, the requirement in article 10 that such service be made in accordance with the law of the State of destination preempts any New York State law inconsistent with the requirements for *57 the service of process in Uruguay. The mandatory language in the Inter-American Convention is comparable to that of the Hague Service Convention (see, Volkswagenwerk AG. v Schlunk, 486 US 694 [1988]).
Even when an action is jurisdictionally sound, a court may choose not to take on the burden of the litigation if it has little or no connection with this State, and may dismiss an action which would be better adjudicated elsewhere (see, Islamic Republic of Iran v Pahlavi, 62 NY2d 474 [1984]). The court must weigh factors including the burden of the litigation upon the court in New York, the potential hardship on the defendant, the unavailability of an alternate forum in which the plaintiff may bring suit, the situs of the relevant transactions, the residence of material witnesses and the location of documents necessary to an understanding of the facts (supra; Davidson Extrusions v Touche Ross & Co., 131 AD2d 421 [2d Dept 1987]). The necessary application of the law of another forum is also an important consideration, especially where the applicable law is that of a foreign State, whose own courts are better equipped to interpret and apply their own law (see, Blais v Deyo, 92 AD2d 998 [3d Dept 1983], affd 60 NY2d 679). No single factor is controlling in a determination by the propriety of a dismissal on grounds of forum non conveniens.
The present action should be dismissed on grounds of forum non conveniens because the number and weight of the relevant factors in the action center in Uruguay and not in New York.
Although most of the parties maintain residences in New York, or travel here from Uruguay fairly regularly, all retain Uruguayan, or dual citizenship and all, except plaintiff and, perhaps, her two sons maintain residences in Uruguay. Despite the parties’ connections to New York, all of the remaining witnesses of importance, Horacio’s surviving sisters Olimpia and Ifigenia and his mother Manolita, reside only in Uruguay. All of these persons are quite elderly, Manolita being, it is reported, 109 years old, Ifigenia has been declared incompetent, due to Alzheimer’s disease, and has been provided by the courts of Uruguay with a guardian. Although plaintiff annexed purported "consents” to be made party plaintiffs to this action, written in English and signed by Olimpia, Augusto (since deceased) and Manolita, there is no indication that any of these elderly parties is willing, or able, to come to New York to testify.
*58 This fact is important because the testimony of these witnesses, together with the evidence contained in documents and court proceedings in Uruguay, will be crucial to the resolution of this action.
Plaintiff claims that the heirs of Joaquin Garcia-Torres entered into an informal distribution agreement in Uruguay in 1949 in an attempt to distribute the artist’s estate. Plaintiff admits that under Uruguayan law this purported distribution made without judicial sanction was without effect legally, but claims that the possession of the works by the various heirs over the next four decades created ownership rights by virtue of adverse possession under Uruguayan law. Plaintiff asserts the 1978 agency agreement executed in Spanish in Uruguay was a valid distribution of the parties’ rights, including plaintiff’s, to the ownership of the various paintings.
The determination of plaintiff’s right to possess any of the paintings, as owner or agent, will depend in the first instance on whether the estate of Garcia-Torres was properly distributed and what share, if any, in any particular painting passed to Horacio. The effect, if any, of the 1978 agreement under Uruguayan law, would next have to be determined.
At this time several lawsuits have been commenced in Uruguay to determine these and other related questions. Plaintiff is free to intervene in these actions and has been served with process in those actions in which she has been named as a party. The resolution of the question of the ownership of plaintiff’s paintings and the other works held by other family members will involve the testimony of Uruguayan residents, the presence of documents in Uruguay and the application of Uruguayan law. Uruguayan law will apply also to the making of the 1978 agreement, and to at least some elements of the distribution of Horacio’s estate. Uruguay has the strongest connection to this case and is the more appropriate forum for the action.
Since the court has granted dismissal on grounds of forum non conveniens, it is unnecessary to address the defendants’ other arguments for dismissal.
Plaintiff’s motion for a preliminary injunction is denied as moot. However, a preliminary injunction would not be appro *59 priate since, at best, there are sharply dispensed facts and plaintiff cannot establish clear entitlement to relief.
The motions to dismiss based on forum non conveniens are granted. The stay is dissolved two days after service of a copy of this decision with notice of entry.

. Defendants Claudio and Aurelio Torres were allegedly served in New York, while Nicolas was allegedly served in Vermont.

. The fourth and final order to show cause was signed on October 8, 1991, and was meant to reinstate the motion. The previous order had lapsed due to an inadvertent default on the part of plaintiff’s attorney.