

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00185-CV

_____

IN THE INTEREST OF R.A. AND D.A., CHILDREN

---

On Appeal from the 231st District Court
Tarrant County, Texas
Trial Court No. 231-617402-17

---

Before Sudderth, C.J.; Pittman and Birdwell, JJ.
Memorandum Opinion by Chief Justice Sudderth

# MEMORANDUM OPINION

## I. Introduction

Appellant Father's parental rights to R.A. and D.A. were terminated through a default judgment, and the children were adopted by Appellees Karl and Maria.[1] In this restricted appeal,[2] Father argues that there is error on the face of the record because there was no strict compliance with the rules for service of process[3] and because the evidence was legally and factually insufficient to support the termination. We affirm.

## II. Restricted Appeal

The parties dispute only the fourth element—whether error is apparent on the face of the record—in this restricted appeal. The face of the record in a restricted

[1]We use pseudonyms to protect the children's identities. *See* Tex. R. App. P. 9.8(b); *see also* Tex. Fam. Code Ann. § 109.002(d) (West Supp. 2018).

[2]A party can prevail in a restricted appeal only if (1) he filed notice of the restricted appeal within six months after the order or judgment was signed, (2) he was a party to the underlying lawsuit, (3) he did not participate in the hearing that resulted in the order or judgment complained of and did not timely file any postjudgment motions or requests for findings of fact and conclusions of law, and (4) error is apparent on the face of the record. *See* Tex. R. App. P. 26.1(c), 30; *Ins. Co. of State of Pa. v. Lejeune*, 297 S.W.3d 254, 255 (Tex. 2009); *see also Clopton v. Pak*, 66 S.W.3d 513, 515 (Tex. App.—Fort Worth 2001, pet. denied).

[3]In several sub-issues, Father argues that substituted service on him was inadequate and defective under rule of civil procedure 106, complaining that the affidavit by Karl and Maria's attorney sponsoring the substituted service was defective, that only one attempt was made before Karl and Maria proceeded to alternative service, and that service was defective because his prior lawyer did not know where Father lived, was not in communication with him, and was not served with the live pleading.

appeal consists of the papers on file with the trial court when judgment was rendered.[4] *Clamon v. DeLong*, 477 S.W.3d 823, 825 (Tex. App.—Fort Worth 2015, no pet.); *see Norman Commc'ns v. Tex. Eastman Co.*, 955 S.W.2d 269, 270 (Tex. 1997) (stating that review by writ of error affords an appellant the same scope of review as an ordinary appeal, restricted only by the requirement that error appear on the face of the record); *see also Alexander v. Lynda's Boutique*, 134 S.W.3d 845, 847 n.5 (Tex. 2004) ("Restricted appeals replace writ of error appeals to the court of appeals.").

## A. Service

For a default judgment to withstand direct attack, strict compliance with the rules governing service of process must affirmatively appear on the face of the record. *Indus. Models, Inc. v. SNF, Inc.*, No. 02-13-00281-CV, 2014 WL 3696104, at *3 (Tex. App.—Fort Worth July 24, 2014, no pet.) (mem. op.); *see Primate Constr. Inc. v. Silver*, 884 S.W.2d 151, 152 (Tex. 1994); *see also PNS Stores, Inc. v. Rivera*, 379 S.W.3d 267, 271 (Tex. 2012) (defining "direct attack" as an appeal, a motion for new trial, or a bill of review). If the record does not show strict compliance with the rules of civil procedure governing issuance, service, and return of citation, then the attempted service of process is invalid, and the judgment must be reversed. *In re J.B.*, No. 02-15-00040-CV, 2015 WL 9435961, at *3 (Tex. App.—Fort Worth Dec. 23, 2015, no pet.) (mem. op.).

---

[4]If extrinsic evidence is necessary to challenge a judgment, the appropriate remedy is to file a motion for new trial or a bill of review proceeding in the trial court. *Clamon*, 477 S.W.3d at 825.

## 1. The Record

Karl and Maria filed their original petition for termination and adoption on April 20, 2017.[5] In their original petition, they stated that Father's last known residence was in Ibb, Yemen, "on what is believed to be Al-Odein Ring Road but is otherwise unknown," and requested substituted service. In their attached affidavit, they averred that the children had lived in Yemen and Michigan prior to September 2016 and that Father had been deported from the United States back to Yemen and was living there. Their attorney attempted to have Father served by certified mail at a post office box address in Ibb City, Republic of Yemen.

Several months later, Karl and Maria filed their first amended original petition, in which they asserted that the Michigan court would defer jurisdiction to the Texas court,[6] and they added an alias to Father's name. They also requested that Father be

[5]In their original petition, Karl and Maria referenced a previously rendered custody determination by a family court in Michigan in which the children's mother was appointed the children's custodian. They further alleged that the mother had executed or would execute an affidavit of relinquishment, that Father had endangered, abandoned, or constructively abandoned the children, and that termination of the parents' rights would be in the children's best interest.

[6]The record contains a December 12, 2017 order from the Michigan court regarding jurisdiction and Karl and Maria's motion to intervene. It reflected that the judgment of divorce between the children's mother and Father was entered in August 2016, with custody awarded to the children's mother, and that Father had filed a motion to change custody. In the order, the Michigan court determined that Karl and Maria had standing to intervene and granted their motion before determining that it no longer had jurisdiction because none of the parties, including the children, had resided in Michigan for over a year and had no significant connection with Michigan, and because the more convenient forum was Texas. Accordingly, the Michigan court

4

served by certified mail, return receipt requested, at a post office box address in "Al Dhehar Zone (Al Odian Ring Road), Ibb City, Republic of Yemen." The first amended original petition was otherwise identical to the original petition. The citation's return receipt was returned unsigned, and the registered mail envelope was stamped "RETURN TO SENDER MAIL SERVICE SUSPENDED TO THIS DESTINATION." *Cf.* Tex. R. Civ. P. 107(c) (requiring the return of a citation served by registered or certified mail to contain the addressee's signature on the return receipt).

On September 15, 2017, Karl and Maria filed a motion for substituted service under rule of civil procedure 106(b)(2). In their motion, they asked the trial court to take judicial notice of the fact that "Yemen is not a signatory of the Hague Convention for Service of Process."[7] They recited that they had tried to serve notice

---

granted the motion to defer jurisdiction to Texas and denied any remaining motions or countermotions that remained pending in the Michigan court.

[7]We take judicial notice sua sponte that the Republic of Yemen is not a party to the Hague Service Convention. *See* Tex. R. Evid. 201(b)(2), (c); *see also* Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361; *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 698, 108 S. Ct. 2104, 2107 (1988) ("The Hague Service Convention is a multilateral treaty . . . ."); *Velasco v. Ayala*, 312 S.W.3d 783, 793 (Tex. App.—Houston [1st Dist.] 2009, no pet.) ("Texas courts have held that '[t]he Hague Convention preempts any inconsistent methods of service prescribed by Texas law in all cases where the Convention applies.'"); Hague Conf. on Private Int'l Law, https://www.hcch.net/en/instruments/conventions/status-table/?cid=17 (listing 73 parties to the convention, including the United States, but not the Republic of Yemen) (last visited Oct. 29, 2018).

and citation on Father in Yemen under rule of civil procedure 108[8] but that the clerk had received the registered return receipt card unsigned such that service was not effective. They then stated that because Father had retained J. Richard Colbeck, a Michigan attorney who had sent Father's motion to change custody in the Michigan court to their Michigan attorney, service of citation with petition on Colbeck or leaving the citation and copy of petition with any of Colbeck's employees in his office "would be the most reasonably effective way to give notice to [Father]" under rules of civil procedure 106(b)(2) and 108.

Karl and Maria sponsored the motion with their attorney's affidavit and attached a copy of Colbeck's change-of-custody motion and an email from Colbeck in which he stated that Father was in regular contact with family in Michigan. Colbeck's motion was dated August 9, 2017; in the motion, Father prayed for the judgment of divorce to be amended to provide that the parties would have joint legal custody "with primary physical care in [Father] through his agents" (family) in Michigan. Attached to the motion was proof of service by Diane M. Pish, asserting that on August 9, 2017, she had served by regular mail a copy of the motion on the mother's attorneys of record. The September 5, 2017 email from Colbeck to Karl and Maria's

---

[8]Rule of civil procedure 108 provides that when the defendant is absent from the state or is a nonresident of the state, the form of notice to him of the suit's institution shall be the same as prescribed for citation to a resident defendant, served by any disinterested person who is not less than eighteen years of age, in the same manner as provided by rule 106, with the return of service completed in accordance with rule 107. Tex. R. Civ. P. 108.

Michigan attorney (forwarded by that attorney to their Texas attorney) stated, "Please be advised that [Father] is alive and well and is speaking to his family here in Michigan on a daily basis. The motion in the divorce case will be filed and scheduled for hearing and you will be getting a copy."

On September 19, 2017, the trial court issued an order authorizing service of citation with the petition attached thereto by the alternative means of serving Colbeck or by leaving a copy of the citation with petition attached with any employee of Colbeck's at his office at 53 E. Chicago Street, Coldwater, Michigan. The next day, Karl and Maria filed their second amended original petition. In their second amended original petition, they added that the registered mail receipt had been returned from Yemen unsigned, that substituted service on Father was necessary, and that substitute service of process should be made by serving Father through his attorney in Michigan, along with Colbeck's name and address.

The Tarrant County service request form reflects that the title of the pleading to be served was the "Second Amended Original Petition for Termination and Adoption" filed on September 20, 2017. Citation was requested by "Sheriff in Michigan" to be served on J. Richard Colbeck, 53 E. Chicago Street, Coldwater, Michigan, as Father's attorney. The citation's return also reflected that the second amended original petition was the pleading being served and that on October 16, 2017, "a true copy of this Citation together with the accompanying copy of SECOND AMENDED ORIGINAL PETITION FOR TERMINATION AND ADOPTION"

7

was served by the Michigan sheriff's deputy to Father via Colbeck pursuant to the trial court's rule 106 order.

On October 18, 2017, Colbeck sent a letter to Karl and Maria's attorney, stating, "Please be advised that I acknowledge that I was served with petitions that have been filed in this matter in the State of Texas. I am unable to accept service of these in that I have not been retained by [Father] for purposes of representation in this matter." The letter was filed on October 23, 2017.

On November 6, 2017, Karl and Maria filed their third amended original petition. In their third amended original petition, they alleged that they had been acting as the children's parents as defined by family code section 152.103(13) and bolstered their belief that the Michigan court would defer to the Texas court because "neither the children's parents nor any person acting as a parent currently reside[s] in the state of Michigan." They also noted that substitute service of process was pursuant to the court's September 19, 2017 rule 106 order. The Tarrant County Service Request Form reflects that they sought to have their third amended original petition served by the sheriff in Michigan on Colbeck as Father's attorney. The citation reflects that a copy of the third amended original petition for termination and adoption accompanied it. The officer's return reflects that "a true copy of this Citation together with the accompanying copy of THIRD AMENDED ORIGINAL PETITION FOR TERMINATION AND ADOPTION" was served on November 15, 2017 "[b]y and through Diane Pish, an employee in the office of

J. Richard Colbeck pursuant to the court order dated September 19, 2017." The officer's return was filed December 4, 2017.

In the trial court's judgment terminating Father's parental rights to R.A. and D.A.,[9] the trial court noted that Father, "although duly and properly cited, did not appear and wholly made default." The trial court terminated Father's parental rights based on the children's best interest and based on Father's having endangered the children. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (2) (West Supp. 2018). It also granted the children's adoption by Karl and Maria.

## 2. Analysis

Rule of civil procedure 106(b)(2) provides that upon motion supported by affidavit stating the location of the defendant's usual place of business or usual place of abode or other place where the defendant can probably be found and stating specifically the facts showing that service has been attempted under either rule 106(a)(1) or 106(a)(2)[10] at the location named in such affidavit but has not been successful, the court may authorize service "in any other manner that the affidavit or other evidence before the court shows will be reasonably effective to give the

---

[9]The trial court issued a corrected final judgment on January 4, 2018.

[10]Or, as here, rule 108, which provides for service via rule 106 to a nonresident or absent defendant. *See* Tex. R. Civ. P. 108. As pertinent here, rule 106(a)(2) provides that citation shall be served by mailing to the defendant by registered or certified mail, return receipt requested, a true copy of the citation with a copy of the petition attached thereto. *See* Tex. R. Civ. P. 106(a)(2).

defendant notice of the suit." Tex. R. Civ. P. 106(b)(2). Although a higher degree of precision in an affidavit is preferable, the plain language of the rule does not require the affiant to state that the address is the defendant's usual place of abode or business or a place where the defendant can probably be found. *Goshorn v. Brown*, No. 14-02-00852-CV, 2003 WL 22176976, at *2 (Tex. App.—Houston [14th Dist.] Sept. 23, 2003, no pet.) (mem. op.). Rather, as worded, the rule requires only that the affiant state "*the location* of the defendant's usual place of business or usual place of abode *or other place where the defendant can probably be found.*" *Id.* (quoting Tex. R. Civ. P. 106(b)) (emphasis added).

Karl and Maria filed a motion for substituted service pursuant to rule 106(b)(2) after their attempt at serving Father in Yemen via certified mail was returned unsigned and stamped return-to-sender because mail service had been suspended to that destination.[11] Their motion, sponsored by their attorney's affidavit, supported that they had attempted to serve Father via rule 106(a)(2).

Father argues that Karl and Maria's initial attempt to serve him via certified mail was inadequate, making substituted service ineffective, because they (and their

---

[11]The U.S. State Department's Bureau of Consular Affairs website notes that as of July 5, 2018, travel to Yemen was not advised "due to terrorism, civil unrest, health, and armed conflict," specifically noting that a "nationwide cessation of hostilities deteriorated in August 2016, and high levels of violence, to include armed conflict, artillery shelling, and air strikes, now persist in areas throughout the country," in addition to Yemen's being "home to the world's largest cholera outbreak." U.S. Dep't of State—Bureau of Consular Affairs, *Yemen Travel Advisory*, https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/yemen-travel-advisory.html (last visited Oct. 29, 2018).

10

attorney, in his sponsoring affidavit) did not expressly state "the location of the defendant's usual place of business or usual place of abode or other place where the defendant can probably be found." *See* Tex. R. Civ. P. 106(b). But while Karl, Maria, and their attorney did not use the exact words found in the rule, they stated in their motion that they "sought to obtain service on [Father] by requesting that the District Clerk serve notice of the Petition and Citation *on his address in Yemen,*" i.e., the location of another "place where the defendant can probably be found," *see id.*, and that this attempt at service was unsuccessful. In his sponsoring affidavit, their attorney stated Father's address and stated that he had asked the district clerk to serve Father via certified mail at that address and that the service was unsuccessful because the receipt card was returned unsigned. He also referenced the receipt that had been filed in the record. That receipt reflects that the registered mail was returned to sender because mail service was suspended to that destination.

It is undisputed that Father was living in Yemen. Accordingly, because the record reflects that mail service was suspended to Yemen, it was irrelevant that Karl and Maria set forth any "magic words." Under these circumstances, we cannot say that the trial court erred by concluding that Karl and Maria met the first part of the rule 106(b) requirement, and we overrule this portion of Father's first issue.

For the same reason—suspension of mail service—we overrule the next portion of Father's first issue, in which he complains that only one attempt was made to serve him in Yemen before alternate service was requested. *Cf. Hubicki v. Festina,*

11

226 S.W.3d 405, 408 (Tex. 2007) (holding that alternative service was not adequate when Festina made a single attempt to serve Hubicki under rule 106(a) before moving for alternative service under rule 106(b) via first class mail to an address in Mexico, there was no evidence that Hubicki was actually receiving mail at the address Festina provided, and there was no evidence that Hubicki was in Mexico when Festina attempted service there).

Further, the requirement of due process of law is met if the notice prescribed affords the party a fair opportunity to appear and defend his interests. *Sgitcovich v. Sgitcovich*, 241 S.W.2d 142, 146 (Tex. 1951), *cert. denied*, 342 U.S. 903 (1952). If the manner of service of citation is reasonably effective to give the defendant notice of the suit and the opportunity to appear and defend same, it does not violate due process. *Id.* at 148. In *Sgitcovich*, the plaintiff, after repeatedly trying to track down her sister, the defendant, at various addresses, ultimately left the citation and petition with the defendant's attorney, who filed an affidavit stating that he was not her attorney in that case, had not been employed by her in that case, and was not her agent to accept service. *Id.* at 145. He did not, however, state that he was unable to contact her or to deliver to her the citation and copy of the petition; that he did not know her address, residence, or whereabouts; or that he had not delivered or forwarded the citation or copy left with him to her. *Id.* The court noted that this was an unusual method of service but that it was "reasonably effective to give the defendant notice of the suit" and thus was "included within the terms of the last clause of Rule 106," because to

12

hold otherwise would make that last clause meaningless. *Id.* at 148; *see also Leach v. City Nat'l Bank of Laredo*, 733 S.W.2d 578, 579–80 (Tex. App.—San Antonio 1987, no writ) (noting that although generally service on an attorney is not sufficient to effect service on his principal unless the attorney is expressly authorized to receive process, under rule 106(b)(2), when the plaintiff alleges, among other things, that the attorney knows the defendant's whereabouts and is able to contact him or give him notice, then rather than service on the attorney as the defendant's agent, service may be ordered through the attorney as an alternate method); *Butler v. Butler*, 577 S.W.2d 501, 504, 507 (Tex. Civ. App.—Texarkana 1978, writ dism'd) (same).

In their motion, sponsored by their attorney's affidavit, Karl and Maria asserted that the reasonably effective way to give Father notice would be to serve his Michigan attorney, who was representing Father in a custody dispute in that state involving the same children. To their motion and affidavit, they attached a copy of the Michigan attorney's motion, dated a little over a month before they filed their motion for substituted service, in which Father sought joint legal custody of the children via his family in Michigan. They also attached a copy of Father's attorney's September 5, 2017 email in which he stated that Father was alive, well, and communicating with his family in Michigan on a daily basis. And although Father's attorney stated in an October 18, 2017 letter to Karl and Maria's attorney that he was unable to accept service of the petitions "in that [he has] not been retained by [Father] for purposes of

representation in this matter," he did not state that he was not in communication with Father or did not know how to get in touch with him.

Accordingly, we conclude on the facts of this record that as in *Sgitcovich*, *Leach*, and *Butler*, service on Father's Michigan attorney was sufficient to give Father "reasonably effective" notice under rule 106(b), and we overrule this portion of Father's first issue. And because the record also reflects that an employee in the office of Father's Michigan attorney—Diane Pish—was served with the third amended original petition—the live pleading—we likewise overrule the remainder of Father's first issue.

## B. The Record—Sufficiency

For a trial court to terminate a parent-child relationship, the party seeking termination must establish by clear and convincing evidence that the parent's actions satisfy at least one ground listed in family code section 161.001(b)(1) and that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *E.N.C.*, 384 S.W.3d at 802.

Father argues that Karl and Maria did not establish that the evidence was legally and factually sufficient to support termination of his parental rights. However, while

he challenges both the legal and factual sufficiency of the evidence in his statement of the issue, he does not otherwise address the factual sufficiency of the evidence to support the trial court's endangerment findings and, other than claiming that Karl and Maria did not establish "that termination of [his] parental rights [was] in the best interest of the children," he does not address the trial court's best interest finding at all. *See* Tex. R. App. P. 38.1(i) (requiring the brief to contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record). Accordingly, we will review whether there is legally sufficient evidence to support the trial court's endangerment findings.[12]

## 1. Standard of Review and Applicable Law

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that Karl and Maria proved the challenged grounds for termination. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we

---

[12]The evidence pertaining to subsections (D) and (E) of family code section 161.001(b)(1) is interrelated, allowing us to conduct a consolidated review of the evidence. *In re S.H.*, No. 02-17-00188-CV, 2017 WL 4542859, at *10 (Tex. App.—Fort Worth Oct. 12, 2017, no pet.) (mem. op.).

15

consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses because that is the factfinder's province. *Id.* And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.*

As we have previously explained, subsections (D) and (E), *see* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), set forth two different standards to determine child endangerment:

> The difference between these subsections is the source of the physical or emotional endangerment to the child. *In re R.S.*, No. 02-15-00137-CV, 2015 WL 5770530, at *3 (Tex. App.—Fort Worth Oct. 1, 2015, no pet.) (mem. op.). Endangerment—defined as exposing the child to loss or injury or to jeopardy—under subsection (D) arises from the child's environment, while endangerment under subsection (E) must be a direct result of a parent's conduct, including acts, omissions, or failures to act. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). However, a parent's conduct can also contribute to an endangering environment under subsection (D) because "abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child." *Id.* (citing *In re W.S.*, 899 S.W.2d 772, 776–77 (Tex. App.—Fort Worth 1995, no writ); *Ziegler v. Tarrant Cty. Child Welfare Unit*, 680 S.W.2d 674, 678 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.)). . . .

> In contrast, termination of parental rights under subsection (E) requires more than a single act or omission by the parent; rather, it requires a voluntary, deliberate, and conscious course of conduct by the parent that endangers the child, even though the conduct need not be directed at the child and the child need not actually suffer injury. *In re L.M.F.*, No. 02-13-00459-CV, 2014 WL 2465137, at *13 (Tex. App.— Fort Worth May 29, 2014, no pet.) (mem. op.) (citing *J.T.G.*, 121 S.W.3d

16

at 125); *see also In re R.W.*, 129 S.W.3d 732, 741 (Tex. App.—Fort Worth 2004, pet. denied) (stating that the factfinder was not required to ignore a long history of dependency and destructive behavior, including abusing drugs and alcohol, in considering endangerment). Furthermore, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *L.M.F.*, 2014 WL 2465137, at *14; *R.W.*, 129 S.W.3d at 739. . . . Domestic violence and a propensity for violence may be considered as evidence of endangerment. *Id.* (citing *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.)).

*In re G.C.*, No. 02-17-00259-CV, 2018 WL 547784, at *20 (Tex. App.—Fort Worth Jan. 25, 2018, no pet.) (mem. op.).

## 2. Analysis

The reporter's record reflects that at the beginning of the hearing, Karl and Maria's attorney offered into evidence five exhibits that had previously been filed in the clerk's record: the mother's affidavits of relinquishment of the two children, her affidavit "setting forth the conditions that she endured living with [Father]," and a "nonmilitary affidavit."[13] In response to their proffer of these exhibits, the trial court replied, "No. . . . If they're in the file, they stay in the file. . . . So you just want me to take judicial notice." Karl and Maria's attorney responded, "Yes," and then the trial court stated, "I don't want to take them out because they've already been filed." After

---

[13]On December 14, 2017, Karl and Maria's attorney filed an affidavit averring that based on a review of his clients' records, Father was not in any branch of the military service when the suit was filed, had not been in military service at any time since then, and was not now in any military service of the United States, and that Father, at the time the suit was filed and at all times since then, was not and is not a United States citizen and had during such time been a resident of Yemen.

17

Karl's testimony, the following dialogue occurred between their attorney and the trial court:

> THE COURT: . . . And you're asking me to take --
>
> [Attorney]: Judicial notice of the contents of the file.
>
> THE COURT: *And then accept* Mother's voluntarily [sic] Affidavit of Relinquishment for each child and *the mother's other affidavit on the conditions that she lived in.*
>
> [Attorney]: Yes, Your Honor.
>
> THE COURT: All right. The Court will do so. [Emphasis added.]

While a trial court may take judicial notice of the contents of its file, it may not take judicial notice of the truth of any factual allegations contained in its file. *See id.* at *7 n.20; *see also* Tex. R. Evid. 201(b)(1)–(2) (stating that the court may judicially notice a fact that is not subject to reasonable dispute because it is generally known within the trial court's territorial jurisdiction or can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned). Accordingly, the facts contained in the children's mother's affidavit on her living conditions could not be judicially noticed.[14] But on this record it is unclear whether the trial court merely

---

[14]In her affidavit, the children's mother recounted that Father lived in Yemen after having been deported from the United States "some years ago," that during the year that she and the children had lived with him in Yemen, he had been verbally and physically abusive to her in front of the children, and that Father was not pleased with her decision to raise their children as Christians and had threatened to harm her if she left Yemen and returned with the children to the United States. She further stated

took judicial notice of the affidavits or whether the trial court admitted them into evidence.

At the hearing, the trial court spoke in the conjunctive—that it would do two things—take judicial notice of the contents of the file (as stated by counsel) "*[a]nd then* accept Mother's [affidavits]."  By use of the term "and," the trial court signaled its intent to do something more with the affidavits than simply take judicial notice of them.  But what the trial court meant by the term "accept" is difficult to ascertain.

However, we need not make this determination because even without the children's mother's affidavit, the evidence is legally sufficient to support the trial court's endangerment findings.  At the December 15, 2017 hearing, Karl testified that R.A. had told him, Maria, and his counselor about his experiences living in Yemen, including his having witnessed Father beat his mother on various occasions; Father's having allowed a friend to duct tape R.A.'s mouth, hands, and feet; and Father's having locked him, his sister, and his mother in a room for long periods of time.  Karl further testified that he and Maria had had to hospitalize R.A. at one point because R.A. had an emotional meltdown.[15]  A psychiatrist had diagnosed R.A. with ADHD,

_____

that she did not want to disclose where she was residing because of threats on her life by Father's family.

[15]A few weeks after Karl and Maria filed their first amended original petition, the trial court issued an order making them the children's temporary managing conservators and thus able to make medical decisions for the children.

19

and R.A.'s counselor had told Karl that R.A.'s symptoms were reflective of post traumatic stress disorder.[16]

Karl testified that the children's mother had placed the children with him and Maria and that they had had possession of the children since September 2016. Accordingly, by the time of the hearing, the children had lived as a part of Karl's household—consisting of him, Maria, their two biological children, and their two adopted children—for over a year, during which time Karl and Maria necessarily became familiar with R.A.'s and D.A.'s emotional and physical needs, particularly after they were made the children's managing conservators in August 2017.

Karl further testified that the children's mother was in hiding, in part because Father's family had threatened her life, and that—like the children's mother—he and Maria were raising R.A. and D.A. in the Christian faith.

Karl testified that he had read the children's mother's affidavit in which she described their living conditions in Yemen, and he opined that Father had knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional condition, that Father had engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being, and that termination of Father's parental rights would be in the children's best interest.

---

[16]Although Father complains that this testimony was based on hearsay, otherwise inadmissible hearsay admitted without objection may not be denied probative value merely because it is hearsay. Tex. R. Evid. 802.

Maria testified that she agreed with Karl's answers to the above questions and confirmed that R.A. had made statements about abuse to her. When she was asked, "Did [R.A.], at one time, tell you that he actually looked out the window in Yemen and saw what was probably [ISIS] killing somebody?" Maria replied, "Yes." She also answered affirmatively when asked whether R.A. had recounted to her an occasion when they had hidden in a basement because ISIS was systematically going through houses and shooting people.

Maria further testified, under the questioning of the children's ad litem, that R.A. had been seven years old when he came to live with her family and had had emotional anxiety at first, hitting the wall, banging his head on the wall, and throwing things when he became upset. He had been unable to count to ten and could not recognize the letters of the alphabet at that time, but he was now able to both count to 150 and write it out, knew the whole alphabet, and was starting to read. R.A. suffered from dyslexia, but Maria opined that there had also been neglect, trauma, and too much stress from his past experiences, which had made it hard for him to learn. With regard to the children, Maria testified as follows,

Q. How's [R.A.] doing today?

A. Amazing. Really well.

Q. Okay. What about [D.A.]?

A. Fabulous.

Q. And she does well in school?

21

A. Yes.

The children's ad litem reported to the trial court that she had been to Karl and Maria's home and met them and the children, had spoken with R.A.'s counselor and reviewed her report,[17] reviewed the adoption home study,[18] and talked to the children's school, and she represented to the trial court "that the termination is in the children's best interest."

Although only limited testimony was provided at the hearing, what was presented was sufficient for the trial court to have formed a firm belief or conviction that Father had knowingly placed or knowingly allowed R.A. and D.A. to remain in conditions or surroundings that endangered their physical or emotional well-being while they lived with him in Yemen. *See In re S.G.*, No. 02-14-00245-CV, 2015 WL 392772, at *5 (Tex. App.—Fort Worth Jan. 29, 2015, no pet.) (mem. op.) ("Abusive or violent conduct by a parent may produce an environment that endangers the child's physical or emotional well-being."); *see also* Alice Richards, *Bombs and Babies: The*

---

[17]The clerk's record contains the business records affidavit filed December 14, 2017, by Gina Galloway, the custodian of records of Galloway Counseling Center, for two pages of records reflecting R.A.'s statements to her during their counseling sessions about Father's interactions with the children and their mother. However, Galloway's business records affidavit and records were not offered into evidence.

[18]The clerk's record contains the adoption home study that was filed in the trial court on August 21, 2017, reciting various facts about Karl, Maria, R.A., and D.A. The study was not offered into evidence. *But see* Tex. Fam. Code Ann. § 107.160 (West Supp. 2018) ("Requirements for Post-Placement Portion of Adoption Evaluation and Report"); *Green v. Remling*, 608 S.W.2d 905, 906 (Tex. 1980) (holding that it was not error for the court to consider a social study prepared and filed in accordance with former statutory provisions governing adoption).

*Intercountry Adoption of Afghanistan's and Iraq's War Orphans*, 25 J. Am. Acad. Matrim. Law. 399, 402 (2013) (citing UNICEF's The State of the World's Children 2006 report regarding "an estimated twenty million children who have been forced to flee their homes due to armed conflict," with more than two million children dead "as a direct result of such conflict").

The trial court could likewise have reasonably formed a firm belief or conviction that Father had engaged in conduct that endangered the children's physical or emotional well-being when he allowed them to witness his abuse of their mother and allowed one of his friends to abuse R.A. *See G.C.*, 2018 WL 547784, at *21 (referencing conduct involving domestic violence as evidence of endangerment); *In re E.G.*, No. 02-14-00351-CV, 2015 WL 1262631, at *9 (Tex. App.—Fort Worth Mar. 19, 2015, no pet.) (mem. op.) ("As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being."); *see also D.N. v. Tex. Dep't of Family & Protective Servs.*, No. 03-15-00658-CV, 2016 WL 1407808, at *1–3, *5 (Tex. App.—Austin Apr. 8, 2016, no pet.) (mem. op.) (affirming termination of parental rights on the basis of endangering conduct—domestic abuse, including criminal charges—when, although both parents faced difficulties "when moving to a new country with a language and culture foreign to them" after witnessing civil war and spending years in a refugee camp, the court could not "allow their past to dictate their children's futures"). We conclude that the

23

evidence of endangerment is legally sufficient and presents no error on the face of the record. We overrule Father's second issue.

### III. Conclusion

Having overruled both of Father's issues, we affirm the trial court's judgment.

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: November 8, 2018